**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

*v.*

**PUBLIC UTILITY COMMISSION, AT & T Communications of the Southwest, Inc., and MCI Telecommunications Corp., Appellees.**

No. 3–92–609–CV.

Court of Appeals of Texas, Austin.

Sept. 15, 1993.

Rehearing Overruled Oct. 20, 1993.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellant.

Dan Morales, Atty. Gen. of Tex., Susan D. Bergen, Asst. Atty. Gen., Austin, for Public Utility Com'n of Tex.

Thomas K. Anson, Anson, Maloney & Hill, L.L.P., Austin, for AT & T Communications.

Scott R. Kidd, James W. Checkley, Jr., Brown McCarroll & Oaks Hartline, Neal R. Larsen, Austin, for MCI Telecommunications Corp.

Before POWERS, KIDD and B.A. SMITH, JJ.

KIDD, Justice.

The Texas Legislature passed a tax bill that increased the franchise taxes for Southwestern Bell Telephone Company ("Southwestern Bell"). In order to recoup the resulting tax expense and pursuant to a legislative statute, Southwestern Bell petitioned the Public Utility Commission (the "Commission") to approve the imposition of a franchise tax pass-through to its customer-rate-payers. Based on the interpretation of an earlier agreement by Southwestern Bell imposing a rate freeze, the Commission denied Southwestern Bell's request. The district court affirmed the Commission's order, and this appeal ensued. We will affirm the judgment of the district court.

## BACKGROUND AND PROCEDURAL HISTORY

### The Tax Legislation

In 1991, the Texas Legislature passed House Bill 11 [1] ("H.B. 11"), a comprehensive tax bill that increased franchise and other taxes for most corporations. Typically, to recover the costs associated with such taxes, a regulated public utility like Southwestern Bell must institute a rate case before the Commission. However, concurrently with the enactment of H.B. 11, the legislature amended section 43(j) of the Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ.Stat. Ann. art. 1446c, § 43(j) (West Supp.1993), to provide a temporary mechanism for a utility to seek recovery of its increased tax costs until its next rate case.[2] Section 43(j) of PURA, as amended by the legislature, provides:

The commission on its own motion or on the petition of a utility shall provide for the adjustment of a utility's billing to reflect any increase or decrease of tax liability of the utility to the state resulting from [H.B. 11] and that is attributable to activities that are subject to the jurisdiction of the commission. Any adjustment to billings under this section must be apportioned prorata to all types and classes of service provided by the utility and is effective only until the commission alters the adjustment as provided by this subsection or enters an order for the utility under this section or Section 42 of this Act. The adjustment of billings must be made effective at the same time as the increase or decrease of tax liability resulting from [H.B. 11] or as soon after as is reasonably practical. Each year after any original adjustment, the commission shall review the utility's increase or decrease of tax liability resulting from [H.B. 11] and alter the adjustment to reflect the increase or decrease. A proceeding under this subsection is not a rate case under this section.

PURA § 43(j). Pursuant to this section, Southwestern Bell petitioned the Commission to impose the franchise tax pass-through on its customers.

### The Rate Freeze Agreement

In 1989, the Commission initiated a rate case involving the reasonableness of Southwestern Bell's rates and services, designated as docket number 8585. Before the date set for the cost-of-service hearing, Southwestern Bell, the Commission, and twenty-four other parties entered into a non-unanimous settlement stipulation ("NUS").[3] Of particular importance to the present appeal, Southwestern Bell in the NUS agreed not to seek an increase in its tariff rates for a four-year period.[4]

1. Act of Aug. 22, 1991, 72d Leg., 1st C.S., ch. 5, 1991 Tex.Gen.Laws 134.

2. Unregulated businesses may independently adjust the prices they charge to their consumers in response to the enactment of H.B. 11; section 43(j) of PURA allows state-regulated utilities, like these unregulated companies, to immediately recover their new tax expenses.

3. The Office of Public Utility Counsel, the City of McKinney, a group of one hundred fourteen Texas cities, and several other intervenors opposed adoption of the NUS.

4. The rate freeze was not absolute. If Southwestern Bell's rate of return dropped below a certain percentage or if unusual events impaired its financial integrity, Southwestern Bell could petition the Commission for an increase in rates.

After the hearing on the NUS, the Commission, in its final order, adopted the NUS[5] with some minor modifications. Those parties that continued their opposition to the NUS sought judicial review of the Commission's order in district court pursuant to section 69 of PURA, Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (West Supp.1993), and section 19 of the Administrative Procedure and Texas Register Act ("APTRA"), Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 19 (West Supp.1993). The trial court affirmed the final order of the Commission adopting the NUS. On appeal, this Court affirmed the Commission's order in substantial part and, in particular, affirmed that portion of the trial court's judgment approving the NUS.[6]

### The Commission Rule

In order to implement the billing adjustments of section 43(j) of PURA, the Commission promulgated an amendment to its Substantive Rule 23.21 by adding subsection (d) that provides in part:

> If a utility chooses not to request an increase under this subsection *or if the utility has otherwise limited itself by agreement* to recovering tax changes that are the subject of this subsection by a method different from that prescribed in this subsection, the utility need not file tariff sheets but shall make an informational filing showing its calculations including an explanation and all underlying supporting documentation showing the effect of H.B. 11 on its taxes.

16 Tex.Admin.Code § 23.21(d) (1993) (emphasis added).

The Commission in its commentary to the amended rule specifically addressed the issue regarding those utilities which had entered into rate-freeze agreements:

> If a utility has agreed to a rate freeze or similar restriction, the parties agreeing to the stipulation have already in some man-

ner allocated the risk of changing tax laws. The utility has accepted the risk of increasing taxes; the signing ratepayers have accepted the risk of decreasing taxes. In deference to standard means of changing rates and the agreement of the parties, the commission should not by rule move to adjust the utility's bills to decrease rates. Likewise, the commission assumes that the utilities will be willing to honor their previous agreements. The language [of the rule] has been changed so that utilities that have an agreement concerning changes in cost of service will not be required to implement the change.

17 Tex.Reg. 110, 111 (1992).

### The Commission Hearing

Pursuant to section 43(j) of PURA, Southwestern Bell petitioned to recover the tax increase imposed by H.B. 11 by filing with the Commission tariff sheets that set forth the distribution of the tax increases among all of its rate classes. The Commission styled Southwestern Bell's application as docket number 10821 and assigned it to an Administrative Law Judge ("ALJ").

AT & T Communications of the Southwest, Inc. ("AT & T"); MCI Telecommunications Corp.; Capital Network Systems, Inc.; the Texas Association of Telephone Answering Services; the Commission's General Counsel; and the Office of Public Utility Counsel were admitted as parties to docket number 10821. AT & T filed a motion to suspend Southwestern Bell's petition. By an order dated April 21, 1992, the ALJ granted AT & T's motion and ordered Southwestern Bell not to implement its requested tax pass-through pursuant to H.B. 11. The ALJ found that granting Southwestern Bell's proposed tax pass-through would violate the rate freeze contained in the NUS to which Southwestern Bell had previously agreed. Specifically, the ALJ stated, "[The NUS] prohibits [South-

---

**5.** The NUS provided, in part, for (1) a one-time credit to residential customers, (2) rate reductions of approximately $73 million annually, and (3) upgrades in Southwestern Bell services and facilities. The NUS also established a unique "earnings sharing" plan in which Southwestern Bell would return to customers a percentage of earnings.

**6.** This Court concluded that the Commission's order was predominantly correct, but held that the Commission did not correctly apply the law as to income-tax savings resulting from expenses disallowed for ratemaking purposes. *Cities of Abilene v. Public Util. Comm'n*, 854 S.W.2d 932, 943–45 (Tex.App.—Austin 1993, writ requested).

western Bell] from proposing any increase in rates or collection of rates for the services listed therein. [Southwestern Bell] assumed the risk of changes in its cost of service down to a 10.49 percent rate of return." The ALJ found that H.B. 11 did not require that a utility automatically pass the burden of the taxes on to its customers. The ALJ further found that rule 23.21(d) limits the ability of a utility that is subject to a rate freeze to impose a tax pass-through on its customers in order to recoup the tax increase imposed by the impact of H.B. 11.

Southwestern Bell appealed the ALJ's order to the Commission. By refusing to hear the appeal and Southwestern Bell's motion for rehearing, the Commission affirmed and adopted the order of the ALJ. Southwestern Bell then brought a suit for judicial review in district court of the Commission's action. In its final judgment, the trial court affirmed the decision of the Commission. Southwestern Bell appeals the judgment of the trial court.

**Points of Error**

By two points of error, Southwestern Bell attacks the Commission's order and the trial court's final judgment of affirmance. Southwestern Bell makes two main arguments for its position. First, Southwestern Bell contends that the billing adjustment provided by section 43(j) is a *tax* and not a *rate,* and therefore, its prior agreement to freeze rates for four years does not bar it from imposing the adjustment on its customers. Second, Southwestern Bell contends that the tax pass-through is mandatory and not permissive and that the Commission erred in denying Southwestern Bell's application because it is entitled to the billing adjustment as a matter of legislative mandate.

**DISCUSSION**

■ Resolution of the issues presented upon this appeal requires statutory interpretation of the salient legislative enactments, i.e., H.B. 11 and PURA section 43(j), as well as construction of the applicable Commission rules, regulations, and orders. The cardinal rule of statutory interpretation is to effectuate the intent of the legislature. *City of Sherman v. Public Util. Comm'n,* 643 S.W.2d

681, 684 (Tex.1983). This intent is obtained from the language of the statute itself. *Id.* "In arriving at the intent and purpose of the law, it is proper to consider the history of the subject-matter involved, the end to be attained, the mischief to be remedied, and the purposes to be accomplished." *Id.* (quoting *Magnolia Petroleum Co. v. Walker,* 83 S.W.2d 929, 934 (Tex.1935)). Furthermore, the contemporaneous construction of a statute by the agency charged with its enforcement is entitled to great weight as long as the construction is reasonable and does not conflict with the plain language of the statute, especially where the statute is ambiguous. *Texas Ass'n of Long Distance Tel. Cos. v. Public Util. Comm'n,* 798 S.W.2d 875, 884 (Tex.App.—Austin 1990, writ denied); *see also* Tex.Gov't Code Ann. § 311.023(6) (West 1988).

■ In its first argument, Southwestern Bell maintains that the legislature's inclusion of the term "adjustment to billing" in section 43(j) demonstrates that the tax pass-through was to be considered a tax and not a rate. To support this proposition, Southwestern Bell relies on the last sentence of section 43(j) of PURA: "A proceeding under this subsection is not a rate case under this section." Southwestern Bell contends that because a section 43(j) proceeding is not a rate case, no rate can result from such a proceeding. In sum, Southwestern Bell argues that the Commission erred in its determination that the proposed tax pass-through violated the terms of Southwestern Bell's rate-freeze agreement.

Traditionally, tax expenses, as operating expenses, have been passed along to a utility's customers through the rate-setting mechanism. *See Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439 (Tex.1987). When the legislature passed H.B. 11, which resulted in an increase in taxes for some corporations, it provided in section 43(j) of PURA a temporary mechanism for regulated utilities to recoup this increased tax burden from its customers. Acknowledging that a contested rate case is an expensive and time-consuming process, we believe that the legislative intent in the following language, "[a] proceeding under

this subsection is not a rate case under this section," was included simply to ensure that this temporary pass-through mechanism would not be subjected to all of the procedural complexities provided for a full-blown, contested rate case. Therefore, we do not agree that the above-quoted legislative language establishes conclusively that the "billing adjustment" is not a "rate increase." However, on the other side of the semantical fence, nothing in the statute suggests affirmatively that the tax pass-through contemplated by the statute is the equivalent of a "rate increase" either. In the final analysis, we conclude that it makes little difference whether the adjustment is labeled a *tax* or a *rate*. The critical inquiry is this: Does the *effect* of the tax pass-through result in an increase in *tariff rates* to Southwestern Bell's customers which is in violation of Southwestern Bell's agreement to freeze rates for a full four years? The Commission answered this question in the affirmative. The district court affirmed the Commission's answer in this regard. We agree with the Commission and will affirm the district court.

The NUS agreement entered into by Southwestern Bell and the other entities provided in pertinent part as follows:

*Southwestern Bell agrees*, except as permitted by paragraphs 8, 17 and 19 herein [7], *not to propose any increase in its* local exchange, Service Connection Charges, Direct Inward Dialing (DID), Direct Outward Dialing (DOD), toll (MTS), WATS, 800 Service, Touch-tone, or Access Service *tariff rates for four years from the date of Commission approval.* For purposes of this Agreement, local exchange will include those services set forth in Attachment 1. Additionally, Southwestern Bell agrees, during the term of this Stipulation and Agreement, not to propose or

7. Southwestern Bell concedes that the exceptions to the rate cap provided in paragraphs 8, 17 and 19 are inapplicable to the present appeal. We agree and do not find it necessary to discuss them in the disposition of this appeal.

8. Evidence from the record supports the Commission's determination that Southwestern Bell assumed the risk of increased taxes in the NUS agreement. During the docket 8585 hearing, Thomas Barry, Southwestern Bell's Vice Presi-

seek to implement a state (intrastate) and user common line charge in the nature of the subscriber line charge imposed by the Federal Communications Commission.

(Emphasis added).

 In making application for the H.B. 11 tax pass-through adjustment, Southwestern Bell filed with the Commission amended *tariff rate sheets* which proposed to recoup the increased taxes from Southwestern Bell's customers. The Commission, after applying its rules and regulations and construing Southwestern Bell's prior agreement to freeze rates, concluded that Southwestern Bell's amended tariffs violated the terms of the rate freeze.[8] We recognize that the Commission is in the best position to evaluate the NUS rate freeze and its impact on the franchise tax pass-through. *See Public Util. Comm'n v. Houston Lighting & Power Co.*, 645 S.W.2d 645, 646 (Tex.App.—Austin 1983, ref'd n.r.e.) (order of administrative agency should be considered under same principles as if it were act of legislature); *see also Texas Liquor Control Bd. v. Attic Club, Inc.*, 457 S.W.2d 41 (Tex.1970). Furthermore, we give due deference to an agency's construction of a statute that the agency is charged with enforcing. *Texas Ass'n of Long Distance Tel. Cos.*, 798 S.W.2d at 884; *see also* Tex.Gov't Code Ann. § 311.023(6) (West 1988).

Whether the billing adjustment is designated a *tax* or a *rate*, we defer to and uphold the Commission in its determination that, under the facts of this case and Southwestern Bell's prior NUS agreement to freeze rates, the H.B. 11 billing adjustment was prohibited. We reject Southwestern Bell's first argument.

 We next address Southwestern Bell's second argument: that the trial court erred

dent of Revenues and Public Affairs, testified that the NUS barred Southwestern Bell from proposing any rate increases. In particular, Barry stated:

We are bearing the entire risk down to a floor of 10.49 return on investment. The [NUS] recognizes that at that point in time, the Company may propose an increase, but all risks down to 10.49 is [sic] absolutely borne by the Company.

in interpreting the language of section 43(j) of PURA as mandatory and not permissive. Southwestern Bell relies on the first sentence of section 43(j) that provides that "the commission on its own motion or on the petition of a utility shall provide for the adjustment of a utility's billing to reflect" the effect of tax changes imposed by H.B. 11. However, the clear language of the statute does not *require* that the utility file such a petition or *mandate* that the Commission make such a motion.

The language of section 43(j) of PURA anticipates that for some regulated utilities H.B. 11 will result in a tax *increase* while for others a *decrease* in tax liability will occur. Since the Commission is charged with protecting the public's interest in the rates and services of public utilities, PURA § 2, Tex. Rev.Civ.Stat.Ann. art. 1446c, § 2 (West Supp.1993), we believe that the legislative language authorizing the Commission to initiate the tax pass-through on its own motion was designed to protect the ratepaying public from situations in which H.B. 11 would in actuality result in a "billing adjustment" decrease and a recalcitrant utility would be unwilling voluntarily to pass the decrease on to its customers. We agree with Southwestern Bell that the statute is mandatory in the sense that if a utility is *entitled* to apply for the pass-through, the Commission has no discretion but to grant the request. However, we reject Southwestern Bell's argument to the extent that it precludes the Commission from enforcing the previously approved NUS agreement, to which Southwestern Bell voluntarily agreed.

Accordingly, we conclude that the *commencement* of a section 43(j) proceeding, whether it be on a utility's petition or the Commission's own motion, is discretionary. We do not construe the statute as depriving the Commission of its authority to enforce its own orders. We reject Southwestern Bell's second argument and overrule both its points of error.

## CONCLUSION

Finding no error, we affirm the district court's judgment affirming the order of the Commission.

POWERS, Justice, dissenting.

I respectfully dissent.

### THE STATUTE

Public utility companies pay franchise taxes. One may say that a utility's ratepayers pay such taxes, in a sense, because they supply through payment of their utility bills the revenue from which their utility company pays its tax liabilities. Along with other taxes, franchise-tax payments enter into the calculation of a utility's "net income" and, ultimately, the official rates by which a utility computes its customer billings. *See generally,* Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 41(c) (West Supp.1993); Ron Moss, *Ratemaking in the Public Utility Commission of Texas,* 44 Baylor L.Rev. 825, 829–30 (1992).

In PURA section 43(j), the legislature directed as follows: "The commission on its own motion or on the petition of a utility shall provide for the adjustment of a utility's" customer billings "to reflect any increase or decrease of tax liability of the utility" when the increase or decrease is attributable to the various amendments of House Bill 11 enacted in 1991. *See* Act of Aug. 22, 1991, 72d Leg., 1st C.S., ch. 5, 1991 Tex.Gen.Laws 134. One observes that the terms of PURA section 43(j) *vest no discretion in the Commission as to whether to provide for the billing adjustment if a utility's tax liability has been increased or decreased due to the amendments made in House Bill 11.* It is undisputed that House Bill 11 resulted in an increase of Southwestern Bell's franchise-tax liability.

The *principle* reflected in the terms of PURA section 43(j) is quite simple and obvious: A utility's customers shall reap the benefit and bear the burden of any change in their utility's tax liability attributable to House Bill 11. Moreover, the *method* chosen by the legislature to effectuate the resulting benefit or burden is through billing adjustments directly, as opposed to effectuating them indirectly through the mechanism of a rate case. "[T]he prescribed method excludes all others, and must be followed."

*Cobra Oil & Gas Corp. v. Sadler,* 447 S.W.2d 887, 892 (Tex.1968). The legislature chose not to make any exception to this statute, principle, and method. It implicitly denied the Commission the power to make any such exception.

Thus, the issue on appeal reduces to the single issue: May the Commission nevertheless affix to PURA section 43(j) an exception not found in the text as it came from the legislature? I believe the answer is clearly "No."

### DISCUSSION

Southwestern Bell Telephone Company petitioned the Commission for a billing adjustment under PURA section 43(j), based on the fact that the company's franchise-tax liability had increased by reason of House Bill 11. The Commission denied relief based on its construction of the agency's rule 23.21(d). *See* Tex.Admin.Code § 23.21(d) (Supp.1993). This rule is quoted in the majority opinion; I need not repeat it here.

The Commission construed its rule 23.21(d) as providing an implied exception to the force and scope of PURA section 43(j): A utility may not obtain the billing adjustment when the utility, in settlement of a previous rate case, has agreed not to seek further rate increases for a specified period of time not yet expired. The rationale claimed for this implied exception is that the parties, when they make such an agreement, have anticipated and allocated in advance the risk of changes in the tax laws; specifically "[t]he utility has accepted the risk of increasing taxes; the signing ratepayers have accepted the risk of decreasing taxes." 17 Tex.Reg. 110, 111 (1992). Finding that Southwestern Bell had made such an agreement in a previous rate case, the Commission enforced its rule 23.21(d) by rejecting Southwestern Bell's petition.

I believe the Commission was powerless, as we are, to create by construction an exception to the scope and force the legislature chose to give PURA section 43(j).

"A court may not write special exceptions into a statute so as to *make it inapplicable under certain circumstances not mentioned*

*in the statute." Public Util. Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex.1988) (emphasis added); *see also Jefferson County Drainage Dist. No. 6 v. Gary,* 362 S.W.2d 305, 307–08 (Tex.1962). The rule against implied exceptions is well-settled in the tenets of statutory construction. A court may occasionally impute an implied exception to a statute when that is necessary to avoid an absurdity or to give effect to what the legislature obviously intended but failed to state. *See North Common Sch. Dist. v. Live Oak County Bd.,* 199 S.W.2d 764, 765–67 (Tex.1946); *Massachusetts v. United N. & S. Dev. Co.,* 168 S.W.2d 226, 229 (Tex.1943). Neither of these two situations exist in the case of PURA section 43(j). Absolutely nothing in the statute indicates that the legislature intended to exclude from the scope and force of the statute a situation where a utility has made an agreement of the kind contemplated by the Commission's order and its rule 23.21(d). PURA section 43(j) is susceptible of a reasonable construction as it is written—it applies generally and without exception to require a billing adjustment when the *statutory* conditions are shown to exist.

If a court is powerless to write an exception into a statute, so as to make it inapplicable under certain circumstances not mentioned in the statute, it necessarily follows that an administrative agency is powerless to do so. Neither a court nor an agency sits to judge the wisdom of legislative enactments. Moreover, there is no reason to give any degree of deference to the Commission's interpretation of this unambiguous statute. *See Calvert v. Thompson,* 339 S.W.2d 685, 688–89 (Tex.Civ.App.—Austin 1960, writ ref'd); *Fulgham v. Southland Cotton Oil Co.,* 296 S.W.2d 332, 334 (Tex.Civ.App.—Austin 1956, writ ref'd).

In summary, the Commission, for a reason it believed sufficient and equitable, has nakedly and starkly suspended the force and effect of PURA § 43(j), contrary to Article I, section 28 of the Constitution of the State of Texas, which places in the legislature the exclusive power to suspend the laws.

For the reasons given, I would reverse the Commission's order and order a remand of

the controversy to the agency for proceedings not inconsistent with my opinion.