**GTE SOUTHWEST INCORPORATED, Appellant,**

v.

**PUBLIC UTILITY COMMISSION and MCI Telecommunications Corporation, Appellees.**

No. 03–97–00619–CV.

Court of Appeals of Texas, Austin.

June 18, 1998.

Celina Romero, Clark, Thomas & Winters, Austin, for Appellant.

James W. Checkley, Jr., Locke Purnell Rain Harrell, Austin, for MCI.

Dan Morales, Attorney General, Andrew S. Miller, Assistant Attorney General, Austin, for PUC.

Before POWERS, KIDD and B.A. SMITH, JJ.

KIDD, Justice.

Appellant GTE Southwest ("GTE") petitioned appellee Public Utility Commission (the "Commission")[1] to increase its 1996 franchise tax "pass-through" to customer-ratepayers pursuant to section 3.211(i) of the Public Regulatory Act of 1995 ("PURA 95").[2] *See* PURA 95 § 3.211(i) (West 1997). The Commission denied GTE's request based on GTE's election to be governed by the rate-freeze provisions of Subtitle H of PURA 95. *See id.* §§ 3.351–.359. The district court affirmed the Commission's order. On appeal, GTE challenges the Commission's decision, claiming that the Commission erroneously applied the Subtitle H rate-freeze provision to GTE's request to increase its 1996 franchise tax "pass-through." We will affirm.

## BACKGROUND AND PROCEDURAL HISTORY

This case concerns the relationship between Subtitle H of PURA 95, and PURA 95 section 3.211(i). To fully understand the issues presented in this case, we will first discuss the statutes in question in some detail.

### PURA 95 Section 3.211(i)

In 1991, the Texas Legislature passed House Bill 11 ("H.B.11"), a comprehensive tax bill that increased franchise and other taxes for most corporations.[3] At the same time, the Legislature amended the predecessor of PURA 95 to permit a *temporary* adjustment to the billings of a public utility to account for the effects of H.B. 11 on the utility's state franchise tax liability. *See* PURA 95 § 3.211(i).[4] This temporary adjustment provides a mechanism for a utility, like GTE, to recover its increased franchise tax costs, until such costs can be incorporated into the utility's rates in the utility's next full-blown rate case. Specifically, PURA 95 section 3.211(i) provides:

The commission on its own motion or on the petition of a utility shall provide for the adjustment of a utility's billing to reflect any increase or decrease of tax liability of the utility to the state resulting from [H.B. 11] and that is attributable to activities that are subject to the jurisdiction of the commission. Any adjustment to billings under this section must be apportioned prorata to all types and classes of service provided by the utility and is effective only until the commission alters the adjustment as provided by this subsection or enters an order for the utility under this section or Section [3.210] of this Act. The adjustment of billings must be made effective at the same time as the increase or decrease of tax liability resulting from [H.B. 11] or as soon after as is reasonably practical. Each year after any original adjustment, the commission shall review the utility's increase or decrease of tax liability resulting from [H.B. 11] and alter the adjustment to reflect the increase or decrease. A proceeding under this subsection is not a rate case under this section.

PURA 95 § 3.211. Thus, this provision allows the utility to temporarily "pass-through" to its customer-ratepayers the increase in its state franchise tax liability until the utility's next rate case. Furthermore, it anticipates that the Commission will review and alter the adjustment to reflect additional increases or decreases in H.B. 11 tax liability each year following the original adjustment.

1. MCI Telecommunications Corporation is a co-appellee in this cause. For the sake of convenience, we will refer to the co-appellees as the Commission.

2. Tex.Rev.Civ. Stat. Ann. art. 1446c–0 (West 1997) ("PURA 95"). In 1997, the Legislature adopted the Texas Utilities Code and codified the provisions of PURA 95. *See* Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 10, 1997 Tex. Gen. Laws 713, 1018. This codification, however was non-substantive. Therefore, for the sake of consistency with the briefs filed in this appeal, we will cite to the provisions in effect immediately prior to codification.

3. Act of Aug. 22, 1991, 72d Leg., 1st C.S., ch. 5, 1991 Tex. Gen. Laws 134.

4. The predecessor of PURA 95 contained an almost identical provision to section 3.211(i) *See* Tex.Rev.Civ. Stat. Ann. art. 1446c, § 43(j) (West Supp.1993). For the sake of simplicity we will only refer to PURA 95 section 3.211(i).

In January 1992, the Commission adopted a rule implementing PURA 95 § 3.211(i). *See* 17 Tex. Reg. 110 (1992). That rule specifies the mechanism by which a utility may *temporarily* "pass-through" the effect of H.B. 11 on its state franchise tax liability to its customers until its next rate case. *See* 16 Tex. Admin. Code § 23.21(e) (West 1997) ("Rule 23.21(e)"). Rule 23.21(e) directs all utilities that are eligible for the "pass-through" to file, in December of each year, a tariff setting forth an "interim" H.B. 11 tax adjustment factor for the next calendar year. *See id.* § 23.21(e)(1),(3). Moreover, the rule requires that the adjustment factor be stated as a percentage of the customer's bill. *See id.* § 23.21(e)(6)(B). Finally, the rule prescribes that the proposed "interim" factor be subject to an annual "true-up" or adjustment filed on or before March 1 of the year following the year that the "interim" factor was in effect.

### Subtitle H of PURA 95

Four years after the enactment of H.B. 11, Subtitle H was added to PURA 95. Subtitle H was enacted to "provide a framework for an orderly transition from traditional return-on-invested-capital regulation to a fully competitive telecommunications marketplace where all telecommunications providers compete on fair terms." PURA 95 § 3.351. Under Subtitle H, an incumbent local exchange company ("ILEC"),[5] like GTE, may voluntarily opt out of traditional cost-of-service rate regulation under Subtitle E of PURA 95 by notifying the Commission of its election to be regulated under Subtitle H. *See id.* § 3.352(a). Subtitle H specifies that the notice of election must state the company's commitment to freeze any increase in the rates charged for covered services for a four-year period. *Id.*

PURA 95 directs that the services provided by an ILEC, electing Subtitle H regulation, be classified into three categories or "baskets," each including a variety of services. Basket I (basic network) lists fifteen services;[6] Basket II (discretionary) lists eight services;[7] and Basket III (competitive) lists nine services.[8] *Id.* §§ 3.352(b)(1), .353, .355, .356. With limited exceptions not relevant to this case, an ILEC electing Subtitle

---

5. An "incumbent local exchange company" is a telecommunications utility that held as of September 1, 1995, a certificate of convenience and necessity to provide local exchange telephone service, basic local telecommunications service, or switched access service within the state. *See* PURA 95 § 3.002(3), (5). GTE is such a company.

6. The following services are Basket I (basic network) services:
(1) flat rate residential and business local exchange telephone service, including primary directory listings and the receipt of a directory and any applicable mileage or zone charges;
(2) tone dialing service;
(3) lifeline and tel-assistance service;
(4) service connection for basic services;
(5) direct inward dialing service for basic services;
(6) private pay telephone access service;
(7) call trap and trace service;
(8) access to 911 service provided by a local authority and access to dual party relay service;
(9) switched access service;
(10) interconnection to competitive providers;
(11) mandatory extended area service arrangements;
(12) mandatory extended metropolitan service or other mandatory toll-free calling arrangements;
(13) interconnection for commercial mobile service providers;
(14) directory assistance; and
(15) "1–plus" intraLATA message toll service.

7. The following services are discretionary services:
(1) "1–plus" intraLATA message toll services, if intraLATA equal access is available;
(2) 0+ and 0–operator services;
(3) call waiting, call forwarding, and custom calling features that are not classified as a competitive service under Section 58.151;
(4) call return, caller identification, and call control options that are not classified as a competitive service under Section 58.151;
(5) central office based PBX-type services;
(6) billing and collection services;
(7) integrated services digital network (ISDN) services; and
(8) new services

8. The following services are classified as competitive services:
(1) services described in the WATS tariff as the tariff existed on January 1, 1995;
(2) 800 and foreign exchange services;
(3) private line service;
(4) special access service;
(5) services from public pay telephones;
(6) paging services and mobile services (IMTS);
(7) 911 premises equipment;
(8) speed dialing; and
(9) three-way calling.

H incentive regulation is prohibited from increasing rates for Basket I (basic network) services for four years following its election. *See id.* § 3.353(b). The Subtitle H company may, however, change its rates for Basket II (discretionary) and Basket III (competitive) services largely without any regulatory oversight by the Commission.

**The Controversy**

Pursuant to PURA 95 section 3.211(i), GTE filed for, and received, a franchise tax adjustment to its billing for the 1992, 1993, 1994, and 1995 tax years. On September 20, 1995, GTE, pursuant to PURA 95 section 3.352, notified the Commission that it voluntarily elected to be subject to Subtitle H incentive regulation. GTE's letter notifying the Commission of its election states, in part:

> This is to notify the Commission that pursuant to Section 3.352 of the Public Utility Regulatory Act of 1995 ("Act"), GTE Southwest Incorporated ("Company") hereby elects to be regulated under the provisions of Subtitle H of the Act, Incentive Regulation of Telecommunications.
>
> The Company commits to limit any increase in the rates charged for services in Section 3.353 of the Act for a four-year period. . . .

Thereafter, on December 1, 1995, GTE filed an application requesting an *increase* in its interim H.B. 11 franchise tax adjustment factor from its 1995 level of .001759 to .002117 for 1996.[9] On April 15, 1996, a Commission Administrative Law Judge ("ALJ") denied GTE's request for an *increase* to its H.B. 11 tax adjustment factor as contrary to its commitment to freeze rates for Basket I (basic network) services. The ALJ, however, granted interim approval of GTE's request for a change in its H.B. 11 tax adjustment factor for its Basket II (discretionary) and Basket III (competitive) services. The ALJ

therefore directed GTE to "file the necessary tariffs to effectuate this ruling on or before May 1, 1996." GTE refused to file the increased adjustment factor on Basket II and Basket III services stating that the computation "would be extremely burdensome if not impossible."

On January 15, 1997, the Commission issued a final order denying GTE's application for an increase to its H.B. 11 tax adjustment factor relating to Basket I services. The Order also denied GTE's request for an increase to its H.B. 11 tax adjustment factor for its Basket II (discretionary) and Basket III (competitive) services for a failure to prosecute such requests. The district court affirmed the Commission's Order. GTE now appeals to this Court the district court's judgment and the Commission's order denying its request to increase its 1996 franchise tax adjustment factor pursuant to PURA 95 section 3.211(i).

**DISCUSSION**

In two points of error, GTE primarily contends that the Subtitle H rate-freeze provision was erroneously applied to its request to increase its 1996 franchise tax adjustment factor pursuant to PURA 95 section 3.211(i). Specifically, GTE argues as follows: the rate-freeze provision applies *only* to the fifteen services listed as a Basket I (basic network) service; the H.B. 11 tax adjustment factor is not among that list of Basket I services; therefore, the rate-freeze provision is not applicable to its request to increase its 1996 tax adjustment factor pursuant to section 3.211(i).

GTE misconstrues its obligation under Subtitle H of PURA 95. PURA 95 sections 3.352(a) and 3.353(b) clearly state that upon election of Subtitle H, GTE *commits* itself "to limit *any* increase" "in rates for basic

9. The H.B. 11 surcharge factor is simply a percentage factor by which the rates for telecommunications services, including Basket I services, are increased to recover cost-of-service increases in franchise taxes. For example, in 1995, GTE's *surcharge factor was .001759. This means that if a customer purchased only Basket I services, that customer did not pay the tariff rates for those Basket I services; instead, the customer paid 1.001759 times those tariff rates. For 1996,*

GTE requested an *increase* in the surcharge factor to .002117. If the Commission had granted this request, then the total charges paid by the customer-ratepayers for Basket I services would have increased. By increasing the amount of money paid by customer-ratepayers for Basket I services, the increases to the surcharge have the effect of increasing the rates for those services. This is expressly forbidden by Subtitle H.

network services" "for a four year period" of time. PURA 95 §§ 3.352(a), .353(b). Given this commitment by GTE, we hold that an increase in GTE's franchise tax adjustment would be contrary to GTE's promise and election under Subtitle H.

PURA 95 section 3.211(i) prescribes that "[a]ny adjustment to billings under [section 3.211(i) ] *must be apportioned prorata to all types and classes of service provided by the utility....*" *Id.* § 3.211(i). Because this provision requires a prorata increase to "all types" of service, GTE faces the impossible task of keeping its rates for Basket I services at the status quo as prescribed by Subtitle H. *See id.* §§ 3.352(a), .353(b).

Despite this provision of PURA, the dissent argues that GTE's requested franchise tax adjustment-increase does not constitute a *rate increase,* but rather is merely an automatic pass-through or adjustment. This Court has addressed and rejected a similar argument offered by the dissent in two previous cases. *See Southwestern Public Serv. Co. v. Public Util. Comm'n,* 962 S.W.2d 207 (Tex.App.—Austin 1998, pet. requested); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 863 S.W.2d 754 (Tex.App.—Austin 1993, writ denied).

In *Southwestern Bell,* we were asked to determine whether a rate-freeze provision contained in a non-unanimous settlement stipulation ("NUS") agreed to by Southwestern Bell *before* the enactment of H.B. 11 and section 3.211(i) prohibited Southwestern Bell from seeking a franchise tax adjustment pursuant to the predecessor of section 3.211(i). *See Southwestern Bell Tel. Co.,* 863 S.W.2d at 755–57. The NUS, which Southwestern Bell entered into voluntarily stipulated in part:

> Southwestern Bell agrees .... *not to propose any increase* in its local exchange, Service Connection Charges, Direct Inward Dialing (DID), Direct Outward Dialing (DOD), toll (MTS), WATS, 800 Service, Touch-tone, or Access Service tariff rates

for four years from the date of Commission approval.

*See id.* at 758.

In determining whether this agreement prohibited Southwestern Bell from seeking an H.B. 11 franchise tax adjustment, we examined whether "the *effect* of the tax pass-through resulted in an increase in *tariff rates* to Southwestern Bell's Customers" in violation of Southwestern Bell's rate-freeze agreement. *Id.* at 758. We concluded that it did. *Id.* Such an analysis is persuasive under the facts of this case.

As stated above, PURA 95 section 3.211(i) requires the adjustment to be apportioned *prorata* to all types and classes of services. Thus, an H.B. 11 tax adjustment *effectively increases* the rates for Basket I services. Therefore, just as we held that the Commission properly prohibited Southwestern Bell from adjusting its franchise tax rates as contrary to its NUS, we sustain the Commission's action in refusing to allow GTE to "effectively" increase rates on Basket I services in violation of its Subtitle H election.

Moreover, we believe that the facts of this case are even more compelling to prohibit a franchise tax adjustment-increase than the circumstances that were present in *Southwestern Bell.* Southwestern Bell, unlike GTE, entered into the NUS *prior* to the enactment of H.B. 11 and the franchise tax adjustment provision. Therefore, Southwestern Bell was able to argue that equitably it should not be deprived of a legislative tax adjustment provision that it had no knowledge of at the time it entered into its rate-freeze agreement. By contrast, in the present case, we are presented with a situation where GTE: (1) knew of the franchise tax adjustment provision and had, in fact, taken advantage of it the previous four years; (2) knew of the Commission's explicit commentary suggesting the potential loss of the franchise tax adjustment-increase as a direct consequence of entering into a rate-freeze agreement;[10] and (3) knew of our

---

10. GTE, unlike Southwestern Bell, was privy to the following commentary by the Commission regarding the effects of a rate-freeze agreement on implementing section 3.211(i):

> *If a utility has agreed to a rate-freeze or similar restriction,* the parties agreeing to the stipula-

tion have already in some manner allocated the risk of changing tax laws. *The utility has accepted the risk of increasing taxes;* the signing ratepayers have accepted the risk of decreasing taxes. In deference to standard means of changing rates and the agreement of

decision in *Southwestern Bell* affirming the Commission's refusal to allow a franchise tax adjustment if the utility had agreed to freeze rates. Armed with this knowledge, GTE voluntarily elected to embrace the incentive regulation provisions of Subtitle H. Thus, while these provisions contain significant benefits for GTE, it is likewise bound to uphold its obligation to freeze rates for Basket I services even if this means the forfeiture of an increase in its franchise tax adjustment.

Finally, in a more recent opinion, we implicitly rejected the exact argument offered by the dissent that a pass-through or an adjustment does not constitute a rate. *See Southwestern Public Serv. Co.*, 962 S.W.2d at 218. In *Southwestern*, we were asked to determine, *inter alia*, whether a fuel reconciliation proceeding constituted a ratemaking proceeding. *Id.* A fuel reconciliation proceeding allows a utility company to reconcile its fuel expenses when its predetermined customer rates result in either over or under recovery for fuel expenses. Based on whether there is an over or under recovery for fuel expenses, the utility must impose either a surcharge or refund on a customer's bill. *See id.* at 210.

Important to this appeal was Southwestern's argument that the fuel reconciliation adjustment did not constitute a ratemaking proceeding because the *adjustment* to the customer's bill was not a *rate*. *See id.* at 218. In rejecting this argument, we stated that a "rate" includes "every compensation ... charged, or collected whether directly or indirectly by any public utility for any [service] ..." *see id.*; PURA 95 § 1.003. We held that any proceeding resulting in an increase in compensation to the utility via its customers is, broadly speaking, a ratemaking proceeding. *Id.* This rationale is instructive in the present cause.

The franchise tax adjustment-increase in the instant cause is analogous to the adjustment in a fuel reconciliation proceeding. They are both "adjustments" to the customer's utility bill that are done outside of a full-blown rate case. GTE cannot escape our holding in *Southwestern* that through its pro-rata application, a franchise tax adjustment-increase imposes a prohibited "rate" increase on GTE's customers for Basket I services. As in *Southwestern*, we note that a rate also includes every *tariff* charged by a utility for its service. PURA 95 § 1.003. It is undisputed that the franchise tax adjustment-increase is a "tariff ... charged" by GTE. Therefore, because the requested franchise tax adjustment-increase does increase overall *rates* for Basket I services as prohibited by Subtitle H, we hold that the Commission did not err in refusing GTE's request to increase its franchise tax adjustment. We overrule GTE's points of error.

## CONCLUSION

Having overruled GTE's points of error, we affirm the Commission's order and the district court's judgment.

POWERS, Justice, dissenting.

The legislature explicitly declared that the kind of agency proceeding now before us "is *not* a rate case." PURA § 3.211(i) (emphasis added). The majority conclude nevertheless that such a proceeding *is* a rate case. Believing this to be an unjustified negation of the plainly stated legislative will, I respectfully dissent.[1]

Since 1976, PURA has provided that "[a] utility may not make changes in its *rates* except" by filing in the Commission a statement of intent to change its rates, initiating thereby a rate case. *Id.* § 3.211(a) (emphasis added). *A utility may not under PURA increase its "rates" in any other way.* Since

---

the parties, the commission should not by rule move to adjust the utility's bills to decrease rates. Likewise, the commission assumes that the utilities will be willing to honor their previous agreements. The language [of the rule] has been changed so that utilities that have an agreement concerning changes in cost of service will not be required to implement the change.

17 Tex. Reg. 110, 111 (1992); *see also Southwestern Bell*, 863 S.W.2d at 756.

1. My dissenting views were also expressed in *Southwestern Bell v. Public Utility Commission*, 863 S.W.2d 754, 759 (Tex.App.—Austin 1993, writ denied).

1991, PURA Section 3.211 has provided, however, that a utility may obtain "adjustments" in its customers' bills—to account for increases or decreases in the utility's franchise-tax expense—without the necessity of the utility's changing its "rates" through a rate case.[2] PURA § 3.211(i). Section 3.211(i) explicitly declares that an adjustment proceeding thereunder "is *not* a rate case under" PURA section 3.211(a). The purpose of this provision is to avoid the expense of a rate case when it is not necessary; the "adjustments" lie entirely outside the Commission's ratemaking function.[3] PURA § 3.211(i).

The legislature in 1995 enacted PURA section 3.351. This statute is intended to facilitate an orderly transition from a regulated utility market to a more competitive market. *See* PURA § 3.351. Under the statute, a local exchange company may elect to come under the new regime by so notifying the Commission in writing. By making its election, the company commits itself "to limit any increase in the *rates* charged" for certain services and "increases in *rates* for basic network services are permitted only with commission approval."[4] PURA § 3.353(a), (b) (emphasis added).

PURA section 3.211(i) gives GTE a statutory right to the annual adjustments to its customers' bills; the company exercised the right for several years and the Commission made the necessary annual adjustment in

amounts before GTE elected to be governed by PURA section 3.353(a) and (b).

No statute expressly declares that a local exchange company, such as GTE, surrenders its statutory right to the annual adjustments by electing to be governed by the provisions of PURA section 3.351 enacted in 1995. The majority decision therefore requires an *implication*—a conclusion that PURA section 3.353(a) and (b) *impliedly amended* PURA section 3.211(i) by engrafting thereon an unstated *exception:* the annual billing adjustments would not be available to a local exchange company if the company elected to be governed by the new 1995 provisions of PURA section 3.353(a) and (b). I believe the implied-amendment theory is unquestionably foreclosed by the applicable rules of statutory construction.

It appears in the first place that there is no repugnance between the texts of PURA section 3.353(a) and (b), on the one hand, and PURA section 3.211(i) on the other. PURA sections 3.353(a) and (b) basically forbid "rate increases" without Commission approval. By expressly taking the annual billing adjustments out of the Commission's ratemaking authority and procedures altogether, the legislature removed any possible repugnance. The legislature rather plainly intended both statutes to operate independently: a local exchange company making the election might not, without Commission approval, file

**2.** PURA section 3.211(i) provides that "[t]he commission on its own motion or on the petition of a utility shall provide for the adjustment of a utility's billing to reflect any increase or decrease of tax liability ... resulting from" tax legislation enacted by the legislature in 1991. Subsequent provisions in PURA section 3.211(i) provide for annual adjustments in the amount of the increase or decrease. The 1991 tax legislation is found at Act of August 12, 1991, 72d Leg., 1st C.S., ch. 5, 1991 Tex. Gen. Laws 134–97. The legislature's choice of the words "billing" and "petition" was not accidental.

**3.** Sums paid by a utility for franchise-tax expense are ordinarily treated as operating expenses for the purpose of calculating rates in a rate proceeding conducted in the Commission. *See generally*, Ron Moss, *Ratemaking in the Public Utility Commission*, 44 Baylor L.Rev. 825, 827–43 (1992). *Insofar as rates and tariffs are concerned*, the Commission "may *not* authorize a utility to automatically adjust and pass through to its cus-

tomers changes in costs of the utility" save for an exception not material here. PURA § 3.211(g) (emphasis added). That is why PURA section 3.211(i) does not refer to a utility's "rates" or "tariffs"; it requires instead adjustments in the utility's "billing." Similarly, the legislature chose to direct that adjustments be made pursuant to a utility's "petition" and not the "statement of intent" necessary to initiate a change in a utility's rates and tariff. *See* PURA § 3.211(a). That is why a proceeding initiated by the utility's petition under PURA section 3.211(i) "is not a rate case under this section." PURA § 3.211(i).

**4.** Under PURA section 3.211(a) a utility may change its rates only by filing with the Commission a statement of its intent to do so. The filing of the statement ordinarily initiates a rate case in which the Commission fixes the utility's rates under calculations dictated by other provisions of PURA. Approval of the Commission is not required before filing the statement of intent. *See supra* note 2.

a statement of intent to change its rates, initiating thereby a rate proceeding under PURA 3.211(a), but a utility may continue to obtain an annual billing adjustment because it "is not a rate case." PURA § 3.211(i). This is the obvious and natural construction to be placed upon the words of the two statutes under the familiar rules of statutory construction.[5]

Implications from statutory language are forbidden if the legislative intention may be gathered from a reasonable interpretation of the statute *as written;* implications are permissible *only* after one has first concluded a particular intention of the legislature is *obvious,* but not expressly stated; implications are *never* permitted to *contradict* or *add to* a statute.[6] *Commonwealth of Massachusetts v. United N. & S. Dev. Co.,* 140 Tex. 417, 168 S.W.2d 226, 229 (1942). Courts may not *create* by implication a repugnance in statutory provisions; any repugnance thought to exist must be *positive* as well as *clear* from the text of the statute itself. Even if such a repugnance exists in the statutory language, we are *required* to harmonize and give effect to both *if at all possible* by assigning each a meaning that will achieve that result. *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990); *Duval Corp. v. Sadler,* 407 S.W.2d 493, 498 (Tex.1966); *Standard v. Sadler,* 383 S.W.2d 391, 396–97 (Tex.1964); *see also United States v. Federal Dep. Ins. Corp.,* 560 S.W.2d 119, 121 (Tex.Civ.App.— Houston [1st Dist.] 1977, writ ref'd n.r.e.); 1A *Sutherland Statutory Construction* § 22.13 (1992, 1993) (amendments by implication require affirmative showing legislature intended amendment implied, coupled with

irreconcilable provisions in earlier and later statutes).

I should address this Court's contrary rationale in *Southwestern Public Service Co. v. Public Utility Commission,* 962 S.W.2d 207 (Tex.App.—Austin 1998, pet. requested). There the court gave iron-clad and almost exclusive legal effect to the definition of a "rate" in PURA section 1.003(14), which defines the word to include "every compensation . . . charged, or collected . . . directly or indirectly by any public utility." PURA § 1.003(14). The court noted that the legislature did not amend this definition of "rate;" the court recognized, however, that the legislature must have meant *something* in its declaration that a fuel-reconciliation proceeding "may not be considered a rate case." PURA § 2.212(g)(2)(C). The court confessed that it was "not entirely clear to us" what implications PURA section 2.212(g)(2)(C) might have, but concluded that they amounted only to a legislative intention "that fuel-related proceedings may be conducted separately from others that involve rate-changes." *Southwestern Pub. Serv. Co.,* 962 S.W.2d at 218. This begs the question; obviously a fuel-reconciliation proceeding must be conducted separately from a rate case because the two are antithetical.[7] While fuel costs form only a component of total operating expenses in a rate case, a fuel-reconciliation proceeding aims at adjusting only the anomalies resulting from actual, fluctuating fuel prices since the end of the last rate case and the beginning of a future rate case. The obvious intention of the legislature was to avoid the time and expense of a full-scale rate case, both to the public and to the utility, when the issue involves only a single

---

5. Courts shall construe any question regarding statutes so as to give effect to the purpose of the legislature, deriving the legislative intention from a general view of the whole enactment. *Citizens Bank of Bryan v. First State Bank,* 580 S.W.2d 344, 348 (Tex.1979). The words of a statute are not to be forced beyond what their meaning in ordinary usage will bear. *Railroad Comm'n of Tex. v. Miller,* 434 S.W.2d 670, 672 (Tex.1968). *See supra* note 2.

6. PURA provides no method for changing a utility's rates save by a *rate case* initiated by the Commission on its own motion or by a utility's filing a statement of intent to change its rates. PURA section 3.211(i) declares that an annual

billing adjustment thereunder "is not a rate case." The majority declare that the adjustment results in an "increase in rates" forbidden by PURA section 3.351(a), (b). Because a utility's rates may not be increased save through an order resolving a rate case, the majority necessarily conclude an annual billing adjustment *is* a rate case. This construction *contradicts* PURA section 3.211(i) (declaring an annual adjustment is not a rate case) and *adds to* PURA section 3.211(i) a proviso not expressed in the words of that section.

7. *See supra* note 2, 4, 6.

item of what are indisputably operating expenses—fuel costs in *Southwestern Public Service Co.,* franchise taxes in the present appeal.

In *Southwestern Public Service Co.* the court at least suggested a minimal legal effect that might survive in the legislative mandate that a fuel-reconciliation proceeding "may not be considered a rate case." Here the majority decline to suggest *any* legal effect and meaning that might be attributed to the legislative mandate that a proceeding under PURA section 3.211(i) "is not a rate case." What meaning and effect does that statutory provision now have? The majority opinion necessarily concludes this statute is entirely neutered and without meaning or legal effect.

Because I believe the majority's decision plainly contravenes the venerable rules of statutory construction set out above, I cannot agree.