520 So.2d 404 (1988)
CONOCO, INC.
v.
LOUISIANA PUBLIC SERVICE COMMISSION and Enterprise Pipeline Company.
No. 87-CA-1288.
Supreme Court of Louisiana.
February 29, 1988.
Rehearing Denied March 31, 1988.
*405 Roy C. Cheatwood, Edward B. Poitevent, III, Nancy Scott Degan, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for appellant.
William O. Bonin, Landry, Watkins & Bonin, New Iberie, Edward R. Adwon, Houston, Tex., Marshall B. Brinkley, Baton Rouge, for appellees.
COLE, Justice.

FACTS
In the early 1970's Conoco (then known as Continental Oil Company) conceived a plan to have a pipeline constructed which would serve its needs for transporting ethane to one of its ethylene plants. Conoco decided not to construct the pipeline itself, but rather entered into a business agreement with Enterprise Products Company wherein Enterprise Products Company would form a new and separate entity, Enterprise Pipeline Company, which would build a pipeline with funds loaned to it by Texas National Bank. The loans were to be secured in part by a mortgage on the pipeline and by Conoco's guarantee on the notes.
On September 12, 1973, Conoco, Enterprise Pipeline, and Texas National Bank signed a "Pipeline and Product Agreement." Enterprise Pipeline agreed to build and own what came to be known as the Cajun Pipeline. Enterprise Pipeline also agreed to lease the pipeline to Conoco, with the term of the lease to be from the completion date of the pipeline through the payout of the entire indebtedness due by Enterprise to the bank and Conoco. The lease was assigned to Texas National as further security.
During this lease period, and as agreed to in the Pipeline and Product Agreement, Conoco paid three-fourths cent per gallon of ethane transported over the length of the pipeline. After the outstanding debt for building the pipeline was paid out, Conoco began paying one-half cent per gallon. This rate also was agreed to in the Pipeline and Product Agreement, and was to continue as the rate for the life of the pipeline or a period not to exceed twenty-five years.
Other shippers besides Conoco used the pipeline, and at the time this litigation started in 1983, these other shippers were paying one and three-fourths cents per gallon, prorated as to injection points. Then, late in 1983, Enterprise Pipeline filed a common carrier pipeline tariff on the Cajun Pipeline with the Louisiana Public Service Commission proposing a tariff of one and three-fourths cents, which would apply to all shippers. Only Conoco objected to the proposal. Conoco felt it should continue to pay the contractual rate of one-half cent.
Evidence was heard by the Commission's hearing examiner on January 13 and 14 of 1986, and the matter was considered by the Commission on November 13, 1986. The Commission rejected the proposed tariff and authorized Enterprise Pipeline to publish a new tariff not to exceed one and two-tenths cent per gallon of liquid ethane transported over the entire length of the pipeline. Conoco petitioned for judicial review to the 19th Judicial District Court pursuant to Article IV, § 21(E) of the Louisiana Constitution of 1974 and La.R.S. *406 45:262 and 1192. The District Court rendered judgment in favor of Conoco and ordered the Commission to modify its order to maintain in effect the contractual rate between Enterprise Pipeline and Conoco. The Commission's order was affirmed in all other respects. The district court judgment has been appealed directly to this court as authorized by La. Const. Art. IV, § 21(E).

ISSUES
Not at issue in this rate-making case is the question of Cajun Pipeline being a common carrier pipeline subject to the Public Service Commission's jurisdiction. The Commission has so found, and the parties do not contest that finding. A common carrier is clearly subject to the rate-making power vested in the Commission. See generally, La. Const. Art. IV, § 21(B); La.R.S. 45:251 et seq. Also not at issue in this case is the methodology the Commission used in determining the fair rate of return to which Enterprise Pipeline is entitled. Rather, the dispute is over what amount Conoco must contribute to that fair return.
This case presents two issues. First, is the contract between Conoco and Enterprise Pipeline, the Pipeline and Product Agreement signed in 1973, impaired by the tariff authorized by the Commission? Second, if the contract is impaired, then should the contractual rate agreed to by Conoco and Enterprise Pipeline yield to a rate set by the Commission? This second issue presents a conflict between two sets of interests, both recognized and protected by law. The conflict is between the police power of the State to regulate public utilities and the constitutional restrictions against the impairment of obligations.
Issue 1: Is the contract impaired if the Commission sets a rate which Conoco must pay?
We consider this issue because Enterprise Pipeline contends that, in two provisions of the Pipeline and Product Agreement, Conoco has agreed to pay whatever rate is set by the Commission. Section 9.1 of the Pipeline and Product Agreement provides:

Force Majeure. Performance under this Agreement by either Enterprise Pipeline or Continental (other than the payment of any sums due to any party hereto or to any third party) shall be excused if and to the extent that such performance is delayed or prevented by strikes, lockouts, difference with workmen, fire, lightning, explosion, flood, hurricane, tornado, windstorm, storm, riot, war, rebellion, insurrection, act of God or of a public enemy, acts, orders, rules, legislation or regulations of governmental authorities, Federal or State, breakdown or normal inspection and repair periods of the facilities used for the production of the products or services of the respective parties described herein or of the natural gas or other raw material from which they are extracted, including normal or unscheduled Pipeline or plant turnaround, shutdown, or any other cause beyond the control of either party whether similar to or dissimilar from the enumerated causes, and no liability for damages shall attach against either party on account thereof, provided, however, that performance shall be resumed within a reasonable time after such cause, or causes, have been removed, and provided further that no party hereto shall be required against its will to adjust any labor dispute.
Section 12.1 provides:

Laws and Regulations. Enterprise Pipeline and Continental agree to keep, conform and comply with, and all of the terms and provisions of this Agreement shall be and remain subject to, all applicable State and Federal laws and all rules, regulations, orders and directives of any State or Federal governmental authority, governmental agency, regulatory body, commission, court or tribunal having jurisdiction, in connection with any and all matters and things under or incident to this Agreement.
We think it is clear that Section 9.1 is not an agreement by Conoco to pay whatever rate might be set by the Commission. Rather, Section 9.1 is a force majeure provision merely intended to excuse *407 performance whenever performance is rendered impossible. It cannot fairly be interpreted as an agreement by Conoco that Enterprise Pipeline might invoke the jurisdiction of the Commission to change a specifically agreed upon rate set forth elsewhere in the contract.
Neither can Section 12.1 be fairly interpreted as an agreement to have the transportation rates abrogated whenever Enterprise Pipeline should decide to propose a tariff with the Commission. Whether or not the rate is subject to modification by the Public Service Commission does not change the fact that a change in the agreed to rate impairs the contract. The parties agreed to the one-half cent per gallon rate. As the District Court noted in the decision below, the action of the Commission impaired the rate obligations set forth in the agreement between the parties.
It may be that Section 12.1 recognizes the fact that where there is actual conflict between the rate-making power and the right of contract, and the public interest requires it, then contractual obligations must yield to the rate-making power of the State. See, e.g., City of Plaquemine v. Louisiana Public Service Commission, 282 So.2d 440 (La.1973). However, the constitutional restrictions against impairment of obligations require that contracts not be abrogated without careful consideration of all the circumstances and a clear showing that the public interest requires it. The rate-making power should yield to valid contracts whenever that is possible and consistent with the public good.
Issue 2: Should the contractual rate yield to the rate-making power?
As noted above, it is well settled that contracts with common carriers may be abrogated. In City of Plaquemine, 282 So.2d at 442, we stated:
Absent some prohibition the Louisiana Public Service Commission has continuing authority with respect to rates for the sale of natural gas, covered by a long term contract. We have consistently held that contracts entered into between a public utility and its customers are subject to regulatory authority and their terms and conditions with respect to rates are subject to supervision and adjustment by the Commission upon application of either party thereto. Alexandria & W. Ry. Co. v. Long Pine Lumber Co., 152 La. 399, 93 So. 199 (1922); City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365 (1922).
Indeed, despite the proscription against impairment of contracts in Article 1, Section 23 of the 1974 Louisiana Constitution, it has long been held that obligations of contracts must yield to the proper exercise of the police power of the state, as long as that police power is exercised for a public end and is reasonably adapted to the accomplishment of that end. Louisiana Gas Service Co. v. Louisiana Public Service Commission, 245 La. 1029, 162 So.2d 555 (1964); City of Shreveport v. Curry, 357 So.2d 1078 (La.1978); Tucker v. Special Children's Fundation, 449 So.2d 45 (La. App. 1st Cir.1984).
Conoco offers a novel argument regarding the power of the Commission to abrogate contracts. Conoco concedes the correctness of City of Plaquemine`s holding that some contracts can be abrogated, but Conoco distinguishes the facts of City of Plaquemine with the present case. Here, the contract was entered into before Enterprise Pipeline became a common carrier. Conoco suggests that this fact insulates the contract from regulatory changes.
We disagree. The distinction of having the contract entered into either before or after the carrier becomes a common carrier is a distinction that makes no difference. The regulation of common carriers, and indeed all public utilities, is allowed as an exercise of the police power. Police power is the power of the state to regulate reasonably the actions of its citizens in order to protect or promote the public welfare. Tucker, 449 So.2d at 47. The power of the State to regulate is an inherent power which stems from the theory that when persons choose to live in society they must give up some individual freedom for the *408 good of society. See, id., and citations therein.
Regulation of public utilities is done in order to promote the public welfare by assuring fair access to important services or commodities. Rate-making insures a fair price to the public as well as a fair rate of return to the public utility. Regardless of when a carrier becomes a common carrier, it becomes subject to the rate-making aspect of the police power.
Nevertheless, the fact that contracts may be adjusted in appropriate circumstances does not mean that it is always proper to do so. Though the obligations of contracts must yield to a proper exercise of the police power, that power must be exercised for an end which is in fact public, and the means must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive. Louisiana Gas Service Co., 162 So.2d at 563; see also, Treigle v. Acme Homestead Ass'n, 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575 (1935). Moreover, the Commission's power and authority to fix rates is limited always by due process concerns. Property, including obligations under valid contracts, cannot be taken without due process. La. Const. Art. 1, § 2.
In short, we hold that the rates set in the Pipeline and Product Agreement are potentially subject to change by the Commission. However, this does not mean the Commission is free to change the rates without carefully considering whether such a change deprives Conoco of due process and whether such a change is necessary to promote the public good. The record indicates that the Commission failed to consider these questions adequately.
The Public Service Commission in its brief argues that once it determined that Enterprise Pipeline was a common carrier, they then needed to set rates. They argue further that they were required to set only one rate which would be the same for all shippers. If Conoco were allowed to pay preferential rates, then other users of the pipeline would necessarily be "subsidizing" Conoco's lower rate. This is because a common carrier is entitled to a fair rate of return on investment of capital. If, for example, Enterprise Pipeline needs to be paid one and two-tenths cent per gallon to receive a fair return, and if Conoco only pays one-half cent per gallon, then other users will necessarily have to pay more than one and two-tenths cent. It is the Commission's contention that the foregoing analysis shows that as a matter of law the contract rate must yield. The public end is that all users pay only that which is their fair share toward insuring Enterprise Pipeline a fair return on investment.
This rationale has some merit to it, but unfortunately it is flawed because it leaves out a crucial component of the calculation. That component is Conoco's constitutional rights to its property and right not to have its contract impaired absent necessity. The Commission has not considered whether Conoco has received a fair return on the consideration they provided in signing the Pipeline and Product Agreement. All the parties agree that Conoco had a large financial role in the construction of the pipeline. Conoco guaranteed the loans and incurred some financial risk, and if Conoco had not done so, then the pipeline may never have been built.
Surely Conoco is entitled to a fair return for the risk it took in the matter. However, the Commission failed to consider whether Conoco has yet been compensated fairly.
We express no opinion on whether Conoco has or has not been adequately compensated. But for argument sake, suppose that Conoco has not. If this is true, then forcing Conoco to pay the same rate as other carriers would in effect make Conoco subsidize the other shippers' use of the pipeline. Conoco, after all, expected to be compensated for performance of its obligations by paying only one-half cent per gallon for a period of time. Under this state of affairs, it would be possible to say that Conoco contributed in advance toward Enterprise's fair return, and until Conoco has been paid by the advantageous rates specified in the contract, it is not correct to say the other shippers would be "subsidizing" Conoco's use of the pipeline.
*409 The Public Service Commission forwards another argument in its brief which we must address. They suggest that La. R.S. 45:259 precludes allowing Conoco to pay a different rate than other shippers. We disagree. La.R.S. 45:259 says a common carrier shall not discriminate against shippers "in regard to rates charged under same or similar circumstances." Conoco's financial role in the construction of the pipeline places them in different circumstances vis-a-vis other shippers. Moreover, La.R.S. 45:259 also provides: "Nor shall any carrier be guilty of discrimination when obeying any order of the commission." We hold that the Commission is not absolutely precluded by La.R.S. 45:259 from ordering a tariff which sets different rates when circumstances make different rates just.

CONCLUSION
We hold that contracts with common carriers are subject to rate adjustment by the Public Service Commission. This is true whether the contract was entered into before or after the carrier became a common carrier. However, we also hold the rate-making aspect of the police power is limited by restrictions against impairing contracts. A valid contract cannot be modified by the Commission without a clear finding that the abrogation is exercised for a public end and is reasonably necessary to the accomplishment of that end.
In the case at hand, we find that the Public Service Commission failed to consider whether Conoco has received just compensation for its role in constructing the pipeline. We express no opinion on that question because in reviewing the rate-making process the inquiry of the judiciary is generally confined to a determination of whether the regulatory agency acted unreasonably or arbitrarily. Gulf States Utilities Co. v. Louisiana Public Service Commission, 364 So.2d 1266, 1267 (La. 1978). In light of the Commission's constitutional and statutory mandate to set rates, La. Const. Art. IV, § 21; La.R.S. 45:251 et seq., we believe the correct course is to allow the Commission to reconsider the merits of this case in light of the legal guidelines in this opinion.
If Conoco has not yet been adequately compensated for their part in the construction of Cajun Pipeline, then Conoco should be allowed a lower rate until such time as they are compensated. On the other hand, if Conoco has already received a just return for the risks and other consideration it gave in return for entering into the Pipeline and Product Agreement, then Conoco must pay the same rate as other users of the Pipeline. This is so because the Cajun Pipeline is a common carrier pipeline subject to regulation for the public's best interest. Conoco is not entitled to a windfall at the expense of other users and the public. As we held in City of Plaquemine, supra, the right of contract must yield to the police power to regulate public utilities for the public good.
For the foregoing reasons we reverse the District Court judgment and remand to the Public Service Commission for further proceedings in conformity with this opinion.
REVERSED AND REMANDED.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
The modification of the rate by the Commission was authorized by the contract between the parties, and contracts between a public utility and its customers are subject to the Commission's regulatory authority. City of Plaquemine v. Louisiana Public Service Commission, 282 So.2d 440 (La. 1973). The rate set by the Commission was not unreasonable, arbitrary or capricious. There is no indication that the Commission failed to consider any relevant contractual or equitable factors in fixing the rate.