**MINCRON SBC CORPORATION,**
**Appellant,**

v.

**WORLDCOM, INC., Appellee.**

**No. 01–98–00058–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 20, 1999.

T. Brooke Farnsworth, Bennett S. Bartlett, Houston, for Appellant.

Richard D. Daly, Candyce Thompson Beneke, Houston, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices O'CONNOR and TAFT.

## OPINION

MICHOL O'CONNOR, Justice.

Mincron SBC Corporation, the defendant below and appellant here, appeals from a summary judgment rendered in favor of Worldcom, Inc., the plaintiff below and appellee here. We reverse and remand.

### Factual Background

Mincron is a small, privately-held company that developed and licensed a computer software program. Mincron incurs significant long-distance telephone charges in answering customer questions and servicing this software. In the fall of 1992, Worldcom's predecessor, ATC Long Dis-

tance (ATC) approached Mincron to discuss Mincron's long-distance telephone needs. During these discussions, Mincron explained that it needed to be able to bill its customers for long-distance telephone calls it made on behalf of its customers. Rebilling long-distance charges was, and still is, very important to Mincron's business. ATC represented to Mincron that it would deliver call detail information to Mincron in a format that would allow Mincron to rebill its customers for long-distance charges.

In December 1992, Mincron and ATC executed a contract (the ATC–Mincron contract), which included ATC's agreement to provide the software billing solution for rebilling Mincron's customers. In January 1993, ATC began to provide the detailed information necessary to permit Mincron to rebill its customers.

Sometime after ATC began providing long-distance service to Mincron, ATC merged with Metromedia Communications Corporation, which, in turn, merged with LDDS Communications, Inc. to form LDDS Metromedia Communications, Inc. (LDDS). LDDS, known as a "common carrier" in the telecommunications industry, was required to file a schedule of charges and the classifications, practices, and regulations affecting such charges. This schedule is also known as a "tariff." LDDS filed its tariff in June 1993.

In August 1994, LDDS stopped providing the call detail service to Mincron. On December 30, 1994, after months of unsuccessfully trying to get the call detail service restored, Mincron terminated the long-distance service and contracted with another long-distance carrier that was able to provide it with the call detail information. Mincron offered to pay LDDS for the services Mincron received, but refused to pay for the charges Mincron could not rebill to its customers. Sometime after Mincron canceled the long-distance service with LDDS, LDDS merged with Worldcom.

## Procedural Background

Worldcom sued Mincron to collect the long-distance charges that Mincron refused to pay, under the theories of sworn account and quantum meruit. Worldcom moved for summary judgment, contending there was no fact issue regarding Mincron's receipt of telecommunications services or the accuracy of the charges for those services. Worldcom asserted there was only one issue to resolve: whether LDDS breached the ATC–Mincron contract by not providing Mincron with call detail information. Worldcom asserted the LDDS tariff superseded all agreements between the parties and the tariff exclusively controlled the parties' rights and liabilities. Therefore, Worldcom concluded, because the LDDS tariff did not state that LDDS would provide software rebilling packages to its customers, LDDS was not bound to do so for Mincron.

Mincron responded to Worldcom's motion for summary judgment, asserting four grounds. First, when the ATC–Mincron contract was executed, ATC was not required to file a tariff, and the ATC–Mincron contract was not affected by any later filed tariff. Second, even if the LDDS tariff applied to the terms of the ATC–Mincron contract, the tariff allowed for special customer arrangements. Mincron contends that the call detail service for which it contracted under the ATC–Mincron contract was the same type of service referred to in the "Special Customer Arrangements" provision of the LDDS tariff. Therefore, Mincron asserts, because LDDS never objected to the terms of the ATC–Mincron contract and continued performing, at least for a time, under the contract, LDDS ratified the ATC–Mincron contract, and it became a part of the LDDS tariff. Third, the dispute between Mincron and Worldcom involved the provision of services, and the LDDS tariff applied only to rate-setting. Fourth, there was a fact issue regarding the amount of charges owed on the account.

The trial court rendered summary judgment in Worldcom's favor, without stating its grounds. This appeal followed.

## The Filed Rate Doctrine

Under the Federal Communications Act of 1934, telecommunications service carriers are required to file with the Federal Communications Commission (the FCC) a listing of terms and conditions under which they will provide services to their customers. *See* 47 U.S.C. § 203(a), (b); *see also Kanuco Tech. Corp. v. Worldcom Network Serv., Inc.,* 979 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *Fax Telecommunicaciones v. AT & T,* 952 F.Supp. 946, 951 (E.D.N.Y.1996), *aff'd,* 138 F.3d 479 (2nd Cir.1998). This listing, called a tariff, is a public document that must set out the carrier's charges as well as the classifications, practices, and regulations affecting such charges. *See* 47 U.S.C. § 203(a). Once filed with the FCC, the tariff exclusively controls the rights and liabilities of the parties as a matter of law and supersedes all other agreements between the parties. *See* 47 U.S.C. § 203(c); *see also* ; *Kanuco,* 979 S.W.2d at 372; *Fax Telecommunicaciones,* 952 F.Supp. at 951.

The filed tariff is not a mere contract; it is the law. *See Carter v. AT & T Co.,* 365 F.2d 486, 496 (5th Cir.1966). The filed tariff governs a telecommunications service carrier's relationship with its customers, and such tariffs have the force and effect of law until suspended or set aside. *See Southwestern Bell Tel. Co. v. Metro–Link Telecom, Inc.,* 919 S.W.2d 687, 692 (Tex.App.—Houston [14th Dist.] 1996, writ denied). Once the tariff is filed, customers are conclusively presumed to have constructive knowledge of its contents and the effect of published tariffs. *See Kanuco,* 979 S.W.2d at 372; *Fax Telecommunicaciones,* 952 F.Supp. at 951. As a result, the tariff supersedes any privately negotiated rates that depart from the filed tariff. *Fax Telecommunicaciones,* 952 F.Supp. at 951. This doctrine, known as the "filed rate doctrine," prevents an aggrieved customer from enforcing contract rights that contradict governing tariff provisions or from asserting estoppel against the carrier. *See Kanuco,* 979 S.W.2d at 372; *Fax Telecommunicaciones,* 952 F.Supp. at 951.

The filed rate doctrine has a two-fold purpose. First, the reasonableness of rates in a regulated industry is a question solely for the governing regulatory body. *See Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 161–64, 43 S.Ct. 47, 49–50, 67 L.Ed. 183 (1922). If courts enforced rates other than those filed with the FCC, they would involve themselves in determining the reasonableness of rates, which is the exclusive province of the FCC. Second, the doctrine prevents utilities from discriminating in the prices they charge for the same service among different ratepayers. *See Maislin Indus. v. Primary Steel, Inc.,* 497 U.S. 116, 126, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990). If courts did not enforce the filed rate, discrimination would result among customers. Thus, non-justiciability and anti-discrimination are the core purposes of the doctrine. *Fax Telecommunicaciones,* 952 F.Supp. at 951.

Application of the filed rate doctrine often has seemingly harsh and unfair results. *Maislin,* 497 U.S. at 126–27, 110 S.Ct. at 2766. For example, a carrier must charge the filed tariff rate even if it has quoted its customer a lower rate upon which the customer relied in entering into the contract. *See Marco Supply Co. v. AT & T,* 875 F.2d 434, 436 (4th Cir.1989). Thus, "[n]either the customer's ignorance nor the utility's misquotation of the applicable tariff provides refuge from the tariff or alters the tariff's terms." *Metro–Link Telecom,* 919 S.W.2d at 693. As stated in *Marco Supply,* "while [the customer] may have equity on its side, the law is against it." 875 F.2d at 436.

The filed rate doctrine bars claims for breach of contracts relating to privately negotiated lower rates. This harsh rule

applies even when the conduct of the telecommunications carrier is fraudulent. *See Fax Telecommunicaciones*, 952 F.Supp. at 952. By declining to adjudicate claims of fraud or breach of contract for lower, negotiated rates, courts are able to accommodate the goal of non-justiciability inherent in the filed rate doctrine. *Id.* To do otherwise would force courts to determine what the reasonable rate would be in order to assess damages. *Id.*

To avoid the harsh consequences of the filed rate doctrine, Mincron asserts, in point of error two, that (1) the doctrine applies only to rate-setting, while this case involves the provision of services; (2) the doctrine does not apply to contracts executed before a carrier is required to file a tariff; (3) if the doctrine applies, the ATC–Mincron contract became a part of the LDDS tariff; and (4) the Communications Act's "savings clause" allows Mincron's state law causes of action to survive. Mincron asserts, and Worldcom does not dispute, that when Mincron and ATC entered into the contract in December 1992, ATC was not required to file a tariff. Mincron contends, because no tariff was required in 1992, the filed rate doctrine does not apply to the ATC–Mincron contract even if ATC's successors are later required to file tariffs.

### Application of the Doctrine to the Provision of Services

■ Mincron asserts that the filed rate doctrine does not apply here because this case does not involve rates or ratesetting, but, rather, the provision of services.[1] This issue has been addressed by the United States Supreme Court. *See AT & T v.*

*Central Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). In *Central Office Tel.*, the Supreme Court noted that rates do not exist in isolation; instead, they have meaning only when one knows the services to which they are attached. *Id.* at 1963. The Supreme Court held as follows:

> Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. "If 'discrimination in charges' does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge.... An unreasonable 'discrimination in charges,' that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." ... The Communications Act recognizes this when it requires the filed tariff to show not only "charges," but also "the classifications, practices, and regulations affecting such charges," 47 U.S.C. § 203(a); and when it makes it unlawful to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges" except those set forth in the tariff, 203(c).

118 S.Ct. at 1963 (citations omitted).

Therefore, Mincron cannot escape application of the filed rate doctrine by asserting this dispute involves only the provision of services. Accordingly, we next consider whether the filed rate doctrine applies to

---

**1.** When Mincron filed its brief in this appeal, it relied on the Ninth Circuit Court's holding in *Central Office Tel., Inc. v. AT & T*, 108 F.3d 981 (9th Cir.1997), *rev'd*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) in which an identical argument was made. Central Office Telephone, Inc. (COT), a reseller of long-distance communications services, sued AT & T, a provider of long-distance communications services, under state law for breach of contract and tortious interference with con-

tract. COT asserted, and the Ninth Circuit Court agreed, that, even if COT's claims were covered by the filed rate doctrine, the doctrine did not apply to any of COT's claims regarding billing or provisioning. 108 F.3d at 990. After Mincron filed its brief, the U.S. Supreme Court reversed the Ninth Circuit's holding. *See AT & T v. Central Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

contracts entered into before a telecommunications carrier is required to file a tariff.

### Application of Filed Rate Doctrine to ATC–Mincron Contract

Mincron asserts that, (1) because the ATC–Mincron contract preceded the filing of the LDDS tariff, the tariff does not abrogate the ATC–Mincron contract or (2) if the tariff applies, the ATC–Mincron contract became a part of the LDDS tariff.

#### 1. Abrogation of ATC–Mincron contract

▆▆▆▆ The distinction between having executed a contract before or after a utility becomes a common carrier is a distinction without a difference. *Conoco, Inc. v. Louisiana Pub. Serv. Comm'n*, 520 So.2d 404, 407 (La.1988). In *Conoco*, the court held that Conoco's contract with Enterprise Pipeline was not insulated from regulatory changes, even though the contract was entered into before Enterprise Pipeline became a common carrier. *Id.* The *Conoco* Court reasoned that the regulation of utilities is allowed as an exercise in police power. *Id.* Regulation of public utilities is done to promote the public welfare by assuring fair access to important services or commodities. *Id.* at 408. Rate-making insures a fair price to the public, as well as a fair rate of return to the public utility. *Id.* Therefore, regardless of when a carrier becomes a common carrier, it becomes subject to the rate-making aspect of police power. *Id.* at 408.

▆▆▆▆ Although *Conoco* involved a tariff filed with a state entity (the Louisiana Public Service Commission) and not a federal entity (such as the FCC), we believe that court's reasoning applies to tariffs filed with the FCC as well. The twin goals of a fair return to the utility and a fair price to the public are served by the core purposes of the filed rate doctrine, non-justiciability and anti-discrimination. Thus, when LDDS filed its tariff, it was required to offer non-discriminatory rates to all its customers, including Mincron. Therefore, although Mincron entered into a contract with a carrier that was not required to file a tariff, that carrier evolved into a carrier that was required to file a tariff. When ATC evolved into LDDS and the business relationship between ATC and Mincron continued between LDDS and Mincron, the ATC–Mincron contract became subject to the LDDS tariff. This outcome is the same one that would have resulted had Mincron and LDDS executed a separate contract in August 1994, or if ATC had its own tariff on file in 1992, which would have been superseded by the LDDS tariff. In any event, either contract would have been subject to the LDDS tariff. Therefore, it makes no difference that Mincron began its association with LDDS through a merger; the result is the same: the LDDS tariff controlled the rights and liabilities of Mincron and LDDS and its successor, Worldcom.[2]

#### 2. The ATC–Mincron contract as a "contract-tariff"

▆▆▆▆ Mincron also asserts that the ATC–Mincron contract became a part of the LDDS tariff. We disagree. Even though LDDS continued to provide the call

---

2. The ATC–Mincron contract was executed in 1992. The LDDS tariff became effective June 4, 1993. The record does not indicate when ATC merged with Metromedia Communications Corporation or when Metromedia Communications Corporation merged with LDDS. Mincron asserts there was no summary judgment proof of an actual merger of the companies, leaving fact issues regarding when and how the mergers occurred, and, therefore, when the LDDS tariff would affect the ATC–Mincron contract, if at all. Mincron did not raise this complaint below and has waived any error. However, even if this issue were preserved, the date of the mergers is not dispositive. Regardless of when the mergers occurred, LDDS had assumed its predecessors' rights and liabilities under the ATC–Mincron contract by August 1994, when it stopped providing the call detail information to Mincron. The date of the earliest charge that is the subject of this dispute is December 16, 1994. Therefore, during the time relevant to this dispute, the LDDS tariff was on file with the FCC.

detail services to Mincron for a period of time, this did not transform the ATC–Mincron contract into a "contract tariff."

■ Although a filed tariff governs a telecommunications service carrier's relationship with its customers, there are two ways a carrier can alter the terms of a filed tariff. First, the Communications Act contemplates that a carrier may amend its tariff from time to time. *See* 47 U.S.C. § 203(b). Tariff amendments then supersede a carrier's prior contractual arrangements with customers. *Fax Telecommunicaciones*, 952 F.Supp. at 952. Second, carriers and customers may enter into contracts to file tariffs according to the customer's individual needs. *Id.* Once such "contract tariffs" are filed, they are presumptively lawful. *Id.*

Before 1991, private contracts in the telecommunications field were allowed only between carriers. *Global Access Ltd. v. AT&T Corp.*, 978 F.Supp. 1068, 1072 (S.D.Fla.1997). Common carriers were allowed to negotiate private agreements with other common carriers for the sale terms of telecommunication services. *Id.* Thus were born telecommunications contract tariffs. However, carriers were not allowed to negotiate enforceable, private deals directly with individual customers, but instead had to deliver services and charge rates exclusively based upon general tariffs filed with the FCC. In 1991, contract tariffs between telecommunications carriers and individual customers came into existence. *Global Access*, 978 F.Supp. at 1072. Certain rates are still established by general tariffs, but many terms can now be set by private agreement. *Id.* In order to maintain regulatory oversight over private agreements and pursuant to Communications Act section 211(a), the FCC requires that all contract tariffs be filed as tariffs.

The U.S. Supreme Court has held that, in a regulatory regime that permits the relationship between the parties to be established by private contract, a utility may not alter a material term of the parties' agreement without the customer's consent simply by filing a unilateral tariff amendment. *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 338–40, 76 S.Ct. 373, 378, 100 L.Ed. 373 (1956); *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 352–53, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956). This principle became known as the Sierra–Mobile doctrine.

■ The Sierra–Mobile doctrine derives from two U.S. Supreme Court cases construing the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, and the Federal Power Act, 16 U.S.C. § 791a *et seq. See Mobile Gas Serv. Corp.*, 350 U.S. at 338–40, 76 S.Ct. at 378;[3] *Sierra Pac. Power Co.*, 350 U.S. at 352–53, 76 S.Ct. at 371.[4] Two years later, the *Sierra–Mobile* problem came before the Supreme Court again in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958),[5] in which the Supreme

---

**3.** *Mobile* concerned provisions of the Natural Gas Act. There, a regulated natural gas company entered into a 10–year contract to supply natural gas at a single fixed price. Later, the company, without the consent of the buyer, filed new schedules with the Federal Power Commission (the FPC) purporting to increase the rate. The Court held that the new schedule "was a nullity insofar as it purported to change the rate set by [the] contract" and "that the contract rate remained the only lawful rate." 350 U.S. at 347, 76 S.Ct. at 382. It reasoned that the Natural Gas Act evidenced no purpose to abrogate private rate contracts and expressly recognized that rates to particular customers may be set by individual contracts. 350 U.S. at 338, 76 S.Ct. at

378. This interpretation of the statutory scheme, according to the Court, did not impair the FPC's regulatory powers because the FPC could at any time enter into a proceeding to determine that the contract rate was unreasonable and could modify it if it so found. *See* 350 U.S. at 344–345, 76 S.Ct. at 381.

**4.** The *Sierra* case expressly adopted the *Mobile* Court's reasoning in a similar situation arising under the Federal Power Act, which is virtually identical to the Natural Gas Act.

**5.** In *Memphis*, a regulated gas pipeline company had entered into long-term sale agreements. These agreements, unlike the ones in

Court rounded out the doctrine that the contract governs the normal course of affairs. The rule of *Sierra, Mobile,* and *Memphis* is simple: a regulated entity may not unilaterally modify a filed, privately negotiated contract by filing a new tariff with the regulating entity; instead, the contract can be modified only with the customer's consent. *See Richmond Power & Light v. FPC,* 481 F.2d 490, 493 (D.C.Cir.1973).

Although an FCC-filed contract tariff is not identical to the contracts that were permitted in *Sierra* and *Mobile,* the FCC has stated that the Natural Gas Act and the Federal Power Act are similar in many significant respects to the Communications Act. *Global Access,* 978 F.Supp. at 1073. Therefore, the FCC and the courts apply the Sierra–Mobile doctrine to telecommunications agreements. *See Bell Tel. Co. of Penn. v. FCC,* 503 F.2d 1250, 1278 (3rd Cir.1974) (applying Sierra–Mobile doctrine to telecommunications industry); *Global Access,* 978 F.Supp. at 1073 (same).

The Sierra–Mobile doctrine does not apply here because the ATC–Mincron contract was not filed with the FCC. The Communications Act requires all privately negotiated contracts be filed with the FCC. 47 U.S.C. § 211(a). The filed rate doctrine's principle of non-discrimination is advanced by this requirement because the filed contract tariffs become public information and the carrier offering such terms is bound by them in negotiating with other customers. *See Global Access,* 978

F.Supp. at 1074; *Fax Telecommunicaciones,* 952 F.Supp. at 953. Neither the FCC nor the courts can enforce unfiled rates, regardless of the equitable claims that may be raised against the carrier concerning the formulation of those rates. *See Maislin,* 497 U.S. at 130–33, 110 S.Ct. at 2768–69 (holding that allowing privately negotiated unfiled rates to be enforceable nullified the requirements of non-discriminatory and stable rates as prescribed under the Interstate Commerce Act); *Fax Telecommunicaciones,* 952 F.Supp. at 953 (noting that "the FCC has yet to address how the customers are to enforce these contract[-based tariffs] and whether any liability can arise from [a carrier's] failure to file such contract tariffs as promised."). Enforcing non-filed contract tariffs would contradict both of the twin aims of the filed rate doctrine and the Communications Act. *Fax Telecommunicaciones,* 952 F.Supp. at 953. The *Fax Telecommunicaciones* Court stated as follows:

First, enforcing a contract rate that was never filed flies directly in the face of the anti-discrimination arm of the [Communications Act]. Second, enforcing a contract rate would require the Court to engage in the rate-making process by determining which discounts were available and what would be reasonable charges under the purported contract. The Court is simply not so empowered. Thus, any dispute as to whether the contract itself was valid or whether the terms of the [letter purporting to de-

Sierra and *Mobile,* did not provide for a single fixed rate, but provided that "[a]ll gas delivered hereunder shall be paid for by Buyer under Seller's Rate Schedule ... or any effective superseding rate schedules, on file with the Federal Power Commission." 358 U.S. at 105, 79 S.Ct. at 196. The seller filed a new rate schedule purporting to increase rates over the last filed schedule. The Court held that the newly filed rate was the effective rate and distinguished the case from *Mobile.* Interpreting the contract between the parties, the FPC had concluded that the seller "bound itself to furnish gas to these customers during the life of the agreements not at a single fixed rate, as in *Mobile,* but at what in effect

amounted to its current 'going' rate." 358 U.S. at 110, 79 S.Ct. at 198. The Supreme Court, after scrutinizing the record, concluded there was ample support for the FPC's interpretation of the contract, both factually and legally. *See* 358 U.S. at 114, 79 S.Ct. at 200–01. The Court held that, rather than seeking unilaterally to abrogate its contractual undertaking, the seller in *Memphis* sought "simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract." 358 U.S. at 112, 79 S.Ct. at 199. It was, therefore, concluded that the seller could, consistent with its contractual undertaking, unilaterally increase its rate by filing a new tariff with the FPC.

scribe the service AT & T would provide] could actually be offered to Fax are not material to the determination of Fax's claims.

In light of the purposes of the [Communications Act] and the Supreme Court's decision in *Maislin*, therefore, the Court cannot enforce a contract for an unfiled tariff.

*Fax Telecommunicaciones*, 952 F.Supp. at 954. Because the ATC–Mincron contract was not filed with the FCC, it did not become a part of the LDDS tariff and cannot govern the relationship between the parties.

We recognize that subjecting Mincron to the terms of the LDDS tariff may not be an equitable result. However, to hold otherwise would place this Court in the position of determining what the reasonable rate would be in order to assess damages, and that function is the exclusive province of the FCC.

### Communications Act Savings Clause

■ Mincron asserts that Communications Act section 414 allows state law causes of action that do not interfere with the Act's public policy goals. 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."). Mincron contends that honoring the ATC–Mincron contract will not interfere with the Communication Act's regulatory scheme because Worldcom did not offer Mincron preferential treatment. Mincron asserts that honoring an existing obligation inherited through an acquisition is neither discriminatory nor preferential.

This issue was also resolved by the U.S. Supreme Court in *Central Office Telephone*, which held that a claim for services that constitute unlawful preferences or that directly conflict with the tariff cannot be "saved" under Section 414. 118 S.Ct. at 1965. The savings clause cannot be construed as continuing in customers a common law right, the continued existence of which would be inconsistent with the provisions of the Communications Act. *Id.* "In other words, the act cannot be held to destroy itself." *Id.*

Here, Mincron's claim that Worldcom breached the ATC–Mincron contract survives only if the terms of the contract are consistent with the LDDS tariff. We have already determined that the LDDS tariff controls the rights and liabilities of the parties. Therefore, unless the LDDS tariff allows Worldcom to provide call detail services to its customers, which we address below, Worldcom cannot provide such a service to Mincron, and Mincron's breach of contract claim is not "saved."

### Special Customer Arrangements

■ In point of error three, Mincron asserts that, even if the filed rate doctrine applies, there is a fact question about whether the LDDS tariff lists the additional services that were provided to Mincron in the form of call detail information. Mincron contends the LDDS tariff lists two services that may be the same type of call detail service provided under the ATC–Mincron contract.

ATC agreed to provide the call detail information to Mincron under a service called "Acclaim!" Under "Acclaim!," ATC provided Mincron with billing information separated by the detail of each call and coded by clients, to whom Mincron rebilled the charges. The LDDS tariff does not list an "Acclaim!" service. It does, however, list call detail services that appear to be the same as or similar to those offered under "Acclaim!"

Worldcom asserts that it did not enter into a special arrangement for call detail services with Mincron pursuant to the following provision of its tariff:

8. SPECIAL CUSTOMER ARRANGEMENTS

8.1 In cases where a Customer requests a special or unique arrangement

which may include engineering, conditioning, installation, construction, facilities, assembly, purchase or lease of facilities and/or other special services not offered under this Tariff, LDDS, at this [sic] option, may provide the requested Services. Appropriate recurring charges and/or Nonrecurring Charges and other terms and conditions will be developed for the Customer for the provisioning of such arrangements.

Worldcom contends this provision does not include any call detail or rebilling services. Worldcom also asserts that, even if LDDS had attempted to provide Mincron with these services pursuant to the "Special Customer Arrangements" provision, LDDS was required to file the special contract with the FCC or revise its tariff, neither of which was done. We disagree. Mincron is not asserting that the call detail service it requires is a "special or unique arrangement." Instead, Mincron contends the call detail service it requires may be the type of service offered to all Worldcom customers under the terms of the LDDS tariff.

"Acclaim!" was an extended service plan agreement under which customers, such as Mincron, agreed to a minimum monthly usage for a specified service period. If the minimum usage requirement was met, the customer received a discounted rate. If the minimum usage requirement was not met, the customer had to pay the actual monthly usage, plus the difference between the minimum monthly amount and the customer's actual usage.

The "Performance 2000 Services" and the "Performance 4000 Services" options in the LDDS tariff allow customers to obtain discounts depending on usage. Both of these options also list charges for the following services: "project account codes" and "additional call detail." Mincron contends these services may be the same as or similar to the call detail ser-

vices provided under the ATC–Mincron contract.

We agree with Mincron that there is a fact issue regarding whether the call detail service provided under the ATC–Mincron contract is the same as or similar to the services listed in the LDDS tariff. If the call detail service provided under the ATC–Mincron contract is the same as or similar to the services listed in the LDDS tariff, then Mincron's allegation that Worldcom breached the ATC–Mincron contract is still viable.

We sustain point of error three. Because we sustain point of error three, we sustain point of error two only on the issue of whether Mincron's allegation that Worldcom breached the ATC–Mincron contract is still viable. We overrule point of error two in all other respects.

### Defect in Worldcom's Summary Judgment Evidence

■■■ In point of error four, Mincron asserts there was a fact issue regarding the amount of charges owed to Worldcom because of a defect in Worldcom's summary judgment evidence.

Worldcom's summary judgment evidence included the affidavit of Sha Terrell, attached to which were invoices purporting to show that Mincron owed Worldcom $51,003.21 based on charges from December 16, 1994 through February 16, 1996. The trial court awarded Worldcom $51,003.21, plus interest and fees. On appeal, Mincron asserts that these invoices raise a genuine issue of material fact because Mincron terminated its long-distance service with LDDS on December 30, 1994 and all but one of the invoices are dated after that date.

On appeal, Worldcom does not dispute this inconsistency. Instead, Worldcom asserts this defect is one of form and was waived because Mincron did not object at trial. We disagree. Terrell's affidavit does not state the amount owed by Mincron to Worldcom. Instead, the affidavit

merely refers to the invoices. The only invoice dated before Mincron canceled its service with LDDS totals $14,504.06. This defect is one of substance and may be raised for the first time on appeal. Because Worldcom's own summary judgment evidence raises a fact issue, Worldcom was not entitled to summary judgment.

We sustain point of error four.

We reverse the trial court's judgment and remand.