**ENTEX, a Division of Reliant Energy Resources Corp., formerly known as Entex, a Division of Noram Energy Corp., Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS, Appellee.**

No. 03–99–00746–CV.

Court of Appeals of Texas, Austin.

May 11, 2000.

John F. Williams, Clark, Thomas & Winters, P.C., Austin, for appellant.

Amanda Atkinson Gagle, Nancy E. Olinger, Asst. Attys. Gen., Natural Resources Division, Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices KIDD and B.A. SMITH.

BEA ANN SMITH, Justice.

Appellant Entex, a division of Reliant Energy Resources Corp.,[1] appeals a trial court judgment affirming an order by appellee, the Railroad Commission of Texas (Commission). The issue presented is what rates a utility must charge when it purchases a gas distribution facility from another utility. The Commission ordered Entex, the acquiring utility, to continue charging the rates of the utility from which it acquired a new facility. The district court affirmed the Commission's order. Because we determine the Utilities Code only requires Entex to charge its own authorized rates and precludes it from charging any other rates, we will reverse the judgment and the order and remand to the Commission.

## FACTS AND PROCEDURAL BACKGROUND

Entex operates natural gas distribution systems in East Texas. In October 1993, Entex purchased a small distribution facility from East Texas Industrial Gas Company (ETIG) serving sixty-nine residential customers and two commercial customers in an unincorporated area of Harrison County; these customers were geographically interspersed among Entex's other customers.

Prior to the sale, ETIG charged its customers rates set by a 1983 order of the Commission (Docket No. 4001). *See* Tex. R.R. Comm'n, *Statement of Intent Filed by East Texas Industrial Gas Company to Change Rates in the Unincorporated Area in Harrison County, Texas,* Docket No. 4001 (Gas Utils. Div. Aug. 29, 1983). Entex charges its customers rates set by a 1993 order of the Commission applicable to the environs of forty-two cities in East Texas, including Marshall in Harrison County.[2] *See* Tex.R.R. Comm'n, *Statements of Intent Filed by Entex, Inc. to Change Residential and Commercial Rates,* Docket Nos. 8163–8204 (Legal Div. Feb. 1, 1993) (Docket No. 8187). When Entex purchased the ETIG facility, it charged the seventy-one new customers the rates established for Entex in Docket No. 8187. Entex's rates were considerably higher than those charged by ETIG.

Following a 1995 audit, the Commission concluded that Entex was overcharging the former ETIG customers. The Com-

---

1. Entex is identified as a division of Noram Energy Corp. in the administrative record. Noram Energy Corp. subsequently changed its name to Reliant Energy Resources Corp.

2. An environs rate is one of two kinds of residential and commercial rates subject to the Commission's original jurisdiction. *See* 16 Tex. Admin. Code § 7.7(a) (1999). Environs rates include services to "unincorporated areas adjacent to or near incorporated cities and towns." *Id.*

mission ordered Entex to charge the seventy-one customers the rates authorized for ETIG in Docket No. 4001 and to refund the overcharges from October 1993 forward, plus accrued interest. *See* Tex. R.R. Comm'n, *Application of Entex, a Division of Noram Energy, for a Stipulation and Request for a Declaratory Order With Regard to the Rates in the Environs of Marshall, Harrison County, Texas,* Docket No. 8646 (Legal Div. June 22, 1999) (Docket No. 8646). The Commission made twenty-nine findings of fact and entered thirteen conclusions of law. Entex sought judicial review of the order, and the trial court affirmed.

## DISCUSSION

■ Entex raises one point of error, arguing that it properly charged the seventy-one customers the only rates it was authorized to charge in the area. Thus, Entex asserts that the Commission's order is erroneous as a matter of law. The Commission argues the conclusions of law support its order on several bases. First, the "filed rate doctrine," codified at section 104.005(a) in the Texas Utilities Code, prohibits Entex from charging rates other than those established for ETIG's customers by Docket No. 4001. *See* Tex. Util. Code Ann. § 104.005(a) (West 1998). Second, Entex increased the rates of the former ETIG customers without following the procedures for a rate increase required by the Texas Utilities Code and the Texas Administrative Code. *See id.* §§ 104.102–.103 (West 1998); 16 Tex. Admin. Code § 7.7 (1999). Third, ETIG customers had an implied contract with ETIG to be charged the lower rates; in purchasing the facility, Entex assumed the obligation to

continue charging these rates when it purchased the facility and breached this obligation by charging its own higher rates.[3]

■ We review the Commission's order under the substantial evidence standard of review. *See* Tex. Util. Code Ann. § 105.001 (West 1998). According to the substantial evidence rule, an order that is erroneous as a matter of law must be reversed and remanded for further proceedings if it prejudices substantial rights of the appellant. *See* Tex. Gov't Code Ann. § 2001.174(2)(D) (West 2000). Under the substantial evidence standard of review, administrative determination of a question of law is not entitled to a presumption of validity. *See Teacher Retirement Sys. v. Cottrell,* 583 S.W.2d 928, 930 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). Questions of statutory interpretation are questions of law; therefore, we are not bound by the Commission's construction of a statute. *See id.* However, the Commission's interpretation is entitled to serious consideration if it is reasonable and does not contradict the plain language of the statute. *See Dodd v. Meno,* 870 S.W.2d 4, 7 (Tex.1994).

## I. The Filed Rate Doctrine

■ The United States Supreme Court established the filed rate doctrine to address the unique situation in which a utility files tariffs with a regulatory agency. *See Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The doctrine prohibits regulated utilities from "charging rates for their services other than those properly filed with the appropriate regulatory authority." *Southwestern Bell Tel. Co. v.*

---

3. Both parties contend that the other has engaged in a collateral attack on previous Commission proceedings. The Commission lacks authority to review in a judicial capacity its orders that have become final. *See Public Util. Comm'n v. Brazos Elec. Power Coop., Inc.,* 723 S.W.2d 171, 173 (Tex.App.—Austin 1986, writ ref'd n.r.e.). It cannot re-open a final proceeding. *See id.* To do so would constitute an unlawful collateral attack. Neither party is seeking to amend either Docket No. 4001 or 8187 in a way that constitutes a collateral attack that would require us to address this argument.

*Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex.App.—Houston [14th Dist.] 1996, writ denied). The filed tariff has the effect of law governing the relationship between the utility and its customers. *See id.* The doctrine operates "across the spectrum of regulated utilities" and applies "where state law creates a state agency and a statutory scheme pursuant to which the state agency determines reasonable rates." *Id.* at 692–93 (citing *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 579, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)).

The Texas Legislature codified the filed rate doctrine in the Texas Utilities Code at section 104.005(a). *See* Tex. Util.Code Ann. § 104.005(a). That section states: "A gas utility may not directly or indirectly charge . . . a person a greater or lesser compensation for a service provided . . . by the utility than the compensation prescribed by the *applicable schedule of rates* filed under Section 102.151." *Id.* (emphasis added).

The parties agree the filed rate doctrine is applicable, but reach opposite conclusions as to how the doctrine applies to these facts. The Commission argues the filed rate doctrine requires Entex to charge its acquired customers the rates filed by ETIG. If so, Entex violated section 104.005(a) by charging its own higher rates. The Commission's fourth conclusion of law states that the filed rate doctrine "prohibits Entex from charging the customers of the former ETIG system any rates other than those established in [Docket] No. 4001." Entex argues the applicable filed rate is the tariff filed by the utility providing the service. Entex understands the filed rate doctrine to require Entex to charge all its customers the

same rates. Based on this belief, when Entex began providing the former ETIG customers with natural-gas service in October 1993, it charged them the rates authorized in its Docket No. 8187. To determine the effect of the filed rate doctrine in this situation, we must decide if the governing tariff referenced in section 104.005(a) is the rate applicable to the customers or the rate applicable to the utility.

■ The Commission admits the Utilities Code is ambiguous as to which schedule of rates is referenced in section 104.005(a). But it argues that the Code is intended to protect ratepayers from rate increases by requiring a utility to file a statement of intent with the Commission, give notice in the appropriate county, and allow customers an opportunity to object to the increase before raising rates. *See* Tex. Util.Code Ann. §§ 104.102, .103, .105. The Commission contends these procedural protections against rate increases afford ratepayers a "legally cognizable and protected interest" in their tariffed rates, and this interest should compel this Court to hold that the customers' rates are found in the applicable schedule of rates referenced in section 104.005(a).[4] But we note that the Code's purpose is "to assure rates, operations, and services that are just and reasonable to the *consumers* and to the *utilities.*" *Id.* § 101.002(a) (West 1998) (emphasis added). This policy does not dictate favoring the consumer over the utility as urged by the Commission. The fundamental rule controlling our construction of the section is to ascertain the intention of the legislature as expressed in the language of the statute. *See State v. Terrell*, 588 S.W.2d 784, 786 (Tex.1979). In

---

**4.** In addition to procedural requirements, the Commission argues that the rate order establishes an implied contract between the utility and its customers. *See City of El Paso v. Public Util. Comm'n*, 839 S.W.2d 895, 918 (Tex.App.—Austin 1992), *aff'd in part, rev'd in part on other grounds*, 883 S.W.2d 179 (Tex.

1994). Pursuant to this implied contract, customers have a right to pay their rates until they are properly changed. *See id.* We subsequently address this argument, but mention it here because the Commission says such an implied contract supports the ratepayers' right to their tariffed rates.

ascertaining this intent, courts must examine the entire statute and not merely an isolated portion. *See id.*

 Section 104.005(a) refers to the "applicable schedules of rates filed under section 102.151." Tex. Util.Code Ann. § 104.005(a). Section 102.151 gives us some guidance in discerning which rates are applicable in this situation. In plain language, the section tells us the applicable schedule of rates is the one "in effect for a ... service ... offered by the gas utility." *Id.* § 102.151(a)(2) (West 1998). It does not say the applicable rate is the one offered to specific customers. Reading sections 102.151 and 104.005(a) together, as we must, we hold that the Legislature intended that a utility must charge the rates prescribed by the schedule applicable to services offered by that utility and may not charge the rates of another utility that previously offered services to customers now added to the present utility's system. The statute cannot reasonably be read to refer to the customers' rates as the applicable schedule of rates. We therefore decline to read section 104.005(a) as a guarantee that rates charged by a previous provider will continue in effect after that utility has discontinued its service. Entex has filed the tariff approved in Docket No. 8187 with the Commission. Section 104.005(a) prohibits Entex from charging rates filed by another utility. We will not interpret the "applicable schedule of rates" in a manner that requires Entex to violate the statute itself. *See Clint Indep. Sch. Dist. v. Cash Inv., Inc.,* 970 S.W.2d 535, 539 (Tex.1998).

 This result is supported by the functions of the filed rate doctrine. First, the governing regulatory body determines the reasonableness of the utility's rates. *See Mincron SBC Corp. v. Worldcom, Inc.,* 994 S.W.2d 785, 789 (Tex.App.—Houston [1st Dist.] 1999, no pet.). As recently as 1993, the Commission determined Entex's rates were reasonable for utility customers in the Marshall environs. Second, the doctrine prevents discrimination in prices among customers receiving the same service. *See id.* Allowing a utility to vary its rates among its customers "would open the door for discrimination by the utility." *Metro–Link,* 919 S.W.2d at 693. If Entex charged the lower rates established for ETIG in Docket No. 4001 to seventy-one customers and the higher rates established in Docket No. 8187 to all the rest, it would be discriminating among its customers in the area.[5] Our interpretation of the statute prevents different customers in the unincorporated area of Harrison County who are served by the same utility from being charged different rates. This result may seem harsh to the former ETIG customers, but the United States Supreme Court has acknowledged this as a possibility under the filed rate doctrine. *See Maislin Indus. v. Primary Steel, Inc.,* 497 U.S. 116, 126–27, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Customers may have an implied contract with one utility that it will continue to charge its tariffed rates until it follows the statutory procedures for raising the rates, but they have no guarantee that the same utility will continue to serve them. When a new utility offers service to these customers at its tariffed rates, those rates have been determined reasonable for the new utility in that area.[6]

 This result also comports with other statutory prohibitions on discrimina-

---

**5.** The Commission's argument that the former ETIG customers are entitled to "special rates" rather than "environs rates" is not helpful. Whether the former ETIG customers were subject to a "special rate" or an "environs rate" is not relevant because the pertinent question is what Entex is authorized to charge. Entex may not charge a "special rate" merely because former ETIG customers were so designated by a previous order not involving Entex.

**6.** We note that Entex's customers are free to file a complaint challenging unreasonable rates at any time. *See* Tex. Util.Code Ann. § 104.151(a) (West 1998).

tion by a gas utility. *See* Tex. Util.Code Ann. §§ 104.004, 121.104(a)(2) (West 1998). Section 121.104 prohibits a pipeline gas utility from directly or indirectly charging "greater or lesser compensation for a service provided than the compensation charged ... for a similar and contemporaneous service." *Id.* § 121.104(a)(2). The Commission found Entex's service to the former ETIG customers was not "like and contemporaneous" to its service to other customers because the new customers "did not have notice or an opportunity to participate in Entex's last rate case before the acquisition of the ETIG system." The term "similar and contemporaneous" cannot refer to whether customers had equal input into the process resulting in the rates. If this were the case, then every new customer who moves into a gas utility's service area would have a legitimate claim of discrimination under this section because that customer "did not have notice or an opportunity to participate" in the last rate case. Because contested rate cases are expensive and time-consuming, we do not believe the Legislature intended the statute to be read as allowing potential claims every time a new customer moves into the utility's service area or is brought in by extended service. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 863 S.W.2d 754, 757 (Tex.App.—Austin 1993, writ denied). It is enough that customers generally have been involved in the hearing process; it is not necessary that each individual customer added after the hearing be able to participate in a new hearing.

We hold the filed rate doctrine requires Entex to charge only its authorized rates established in Docket No. 8187 and prohibits it from charging any other rates. The Commission's order requiring Entex to

charge rates established for another utility in Docket No. 4001 is erroneous as a matter of law. Unless this order can be sustained on other grounds, we are required to reverse it. We turn now to the Commission's alternative arguments.

## II. Procedural Requirements

■ The Commission argues that Entex essentially increased the rates it charged the seventy-one customers without following statutory and regulatory procedure. Raising rates without going through proper statutory procedures is unlawful. *See Railroad Comm'n v. Moran Utils. Co.*, 728 S.W.2d 764, 768 (Tex.1987). In determining whether Entex increased its rates, the Commission urges us to look at the increase from the customer's perspective and not from the utility's perspective. From the viewpoint of the customers, the rates increased; for one customer the rate went from $6.00 to $12.92 for the same amount of gas.

The Commission relies on a decision in which we considered whether an adjustment in rates based on a tax pass-through constituted a rate increase. *See Southwestern Bell Tel. Co.*, 863 S.W.2d at 757–58. There, we determined the critical inquiry was whether the *effect* of the tax pass-through resulted in an increase in *tariff rates* to Southwestern Bell's customers. *See id.* at 758. That case is distinguishable from our facts because the court was considering how to characterize an actual adjustment to Southwestern Bell's own rates. *See id.* The facts did not involve rates charged by a previous provider. Here, Entex did not adjust its rates, but continually charged the only rates it was authorized to charge.[7]

7. The Commission also argues that this Court's consideration of the public interest in determining a rate increase in another case requires us to look at these facts from the customers' perspective. *See Texas Ass'n of Long Distance Tel. Cos. (TEXALTEL) v. Public*

*Util. Comm'n,* 798 S.W.2d 875, 886 (Tex. App.—Austin 1990, writ denied). At issue in that case was the Public Utility Commission's (PUC) authorization of a rate increase. *See id.* This Court said the PUC has broad discretion in designing its utility rate structure, but

We agree with Entex that it did not increase *its* rates, but instead extended to new customers the rates it was authorized to charge. Section 104.102(a) says a "gas utility may not increase *its* rates unless the utility files a statement of its intent with the regulatory authority...." Tex. Util.Code Ann. § 104.102(a) (emphasis added). A statement of intent is filed only when the utility proposes to increase its own rates, not when it charges its existing rates to new customers. Because Entex did not increase its rates, Entex was not obligated to follow the procedural requirements associated with rate increases.

## III. Implied Contract

Finally, the Commission argues ETIG had an implied contract with its customers to maintain its rates,[8] that Entex assumed this contract when it purchased ETIG's gas distribution facility, and that Entex breached this contract when it charged higher rates. Whether or not this should be the law, we find no existing authority for the proposition. The Commission cites to the Transition Agreement between Entex and ETIG as evidence that Entex assumed the obligation to maintain ETIG's former rates. According to the agreement, ETIG sold Entex "rights, duties and obligations with respect to the sale or transportation of gas to such customers." We note that this section of the contract deals with Entex's obligation in the transition phase, and not with obligations to customers generally. We have already dismissed the notion that the customers had a contractual right for ETIG to remain in service. *See supra* at 8. Furthermore, we have held Entex is prohibited by section 104.005(a) from charging its customers any rates other than those authorized by the Commission in Docket No. 8187. *See supra* at 7; Tex. Util.Code Ann. § 104.005(a). We reject the Commission's contention that the seventy-one gas customers affected here have an enforceable contractual right distinct from Entex's other customers. "[N]o one has a vested right in any particular utility rate, but only a statutory right shared with others to have rates that are 'just ... and reasonable,' as fixed by the appropriate regulatory body...." *Lopez v. Public Util. Comm'n*, 816 S.W.2d 776, 783 (Tex.App.—Austin 1991, writ denied). ETIG's former customers are entitled to the rights shared with Entex's other customers, that is, the right to be charged the just and reasonable rates established in Docket 8187.[9]

## CONCLUSION

We hold the Commission's order requiring Entex to charge ETIG's rates and to

---

one of the factors the PUC must consider is the public interest, "including the impact that large rate increases would have on the utility's customers ('rate-shock')." *Id.* However, ours is not a case in which the Commission is examining a proposed rate increase. The Commission has already taken into account the public's interest and determined that Entex's rates are just and reasonable in Docket No. 8187.

8. The Commission cites to *Amarillo Gas Co. v. City of Amarillo* for the proposition that the gas company and the consumer have an implied contract that the "gas would be paid for at the rate established by the ordinance then in effect." 208 S.W. 239, 240 (Tex.Civ.App.—Amarillo 1919, no writ). We agree with Entex that this case and its progeny are distinguishable because those cases concern retroactive rate-making, a point not at issue here. *See TEXALTEL*, 798 S.W.2d at 881.

9. The Commission also argues that because Entex purchased all elements of the facility, Entex is subject to regulatory obligations tied to those elements, citing as authority out-of-state regulatory decisions. These decisions are distinguishable to the extent their facts or controlling statutes vary from the facts in this case. *See Entergy Servs., Inc.*, 64 F.E.R.C. 63,026, 1993 WL 566270 (1993) (involving merger in which intervenor expressed concern that cost of merger would be passed to customers); *Citizens Utils. Co.*, 57 C.P.U.C.2d 421 (Cal.P.U.C.1994) (pertaining to law requiring utilities to gain authority to buy telephone exchanges); *U.S. West Communications*, 149 P.U.R.4th 353, 1994 WL 88275 (Wyo.P.S.C.1994) (considering rates according to statute that required approval prior to "any change in any rate which has been established").

refund the overcharges to former ETIG customers was erroneous as a matter of law. Therefore, we reverse the judgment below and the Commission's order and remand the cause to the Commission for entry of an order consistent with this holding.